UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIRTUS PHARMACEUTICALS, LLC<br>  2050 Cabot Blvd West, Suite 200<br>  Langhorne, PA 19047<br><br>           Plaintiff,<br><br>      v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States,<br><br>ANNE MILGRAM, in her official capacity as Administrator of the Drug Enforcement Administration,<br><br>UNITED STATES DRUG ENFORCEMENT ADMINISTRATION<br><br>           Defendants. | Case No. _____ |

# COMPLAINT

Plaintiff Virtus Pharmaceuticals, LLC ("Virtus") brings this Complaint against Defendants, the Honorable Merrick Garland, in his official capacity as Attorney General of the United States; the Honorable Anne Milgram, in her official capacity as Administrator of the Drug Enforcement Administration, and the Drug Enforcement Administration ("DEA"). In support thereof, Virtus states the following:

## PARTIES

1. Plaintiff Virtus is a small, privately held Langhorne, Pennsylvania-based specialty pharmaceutical company that markets safe and effective products by specializing in underserved markets, offering its customers a niche product portfolio covering a range of therapeutic areas.

2. Virtus is incorporated in the state of Delaware with its headquarters in Langhorne, Pennsylvania. Virtus is the owner of Abbreviated New Drug Application ("ANDA") 211484 for levorphanol tartrate 2 mg tablets ("levorphanol"). Levorphanol is classified as a Schedule II controlled substance under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et. seq.* Virtus is also the owner of ANDA 85588 for phendimetrazine 35 mg immediate release ("IR") tablets and New Drug Application ("NDA") 18074 for phendimetrazine 105 mg extended release capsules ("ER") (collectively, "phendimetrazine"). Phendimetrazine is classified as a Schedule III controlled substance under the CSA.

3. Defendant Merrick Garland is the Attorney General of the United States and is in charge of the U.S. Department of Justice ("DOJ"). DEA is a federal law enforcement agency within the DOJ. Attorney General Garland is sued in this matter in his official capacity. He maintains offices at 950 Pennsylvania Avenue, NW Washington, DC 20530.

4. Defendant DOJ is an executive department of the United States. *See* 5 U.S.C. § 101; 28 U.S.C. § 501. The head of the DOJ is the Attorney General. *See* 28 U.S.C. § 503.

5. Defendant Anne Milgram is the Administrator of DEA. The CSA authorizes the Attorney General to delegate his authority under the CSA to any officer or employee of the DOJ. 21 U.S.C. § 871. The Attorney General has delegated his authority under the CSA to DEA Administrator. 28 C.F.R. § 0.100. Administrator Milgram has been delegated authority to administer the CSA and its implementing regulations. Administrator Milgram is sued in this matter in her official capacity. She maintains offices at 8701 Morrissette Drive, Springfield, VA 22152.

6. Defendant DEA is an agency within the DOJ. It was created by Executive Order 11,727. *See* 38 Fed. Reg. 18,357 (July 10, 1973). DEA is charged with, *inter alia*, enforcing the controlled substances laws and regulations of the United States. Its headquarters are located at 8701 Morrissette Drive, Springfield, VA 22152.

7. DEA is an "agency" of the government within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. § 701(b)(1).

## JURISDICTION AND VENUE

8. This action arises under the Constitution of the United States, the CSA, and the APA.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A).

11. An actual and justiciable controversy exists between Plaintiff and Defendants.

## STATUTORY AND REGULATORY BACKGROUND

12. Drugs that are classified as controlled substances under the CSA are divided into five schedules. Substances are placed in their respective schedules based on whether they have a currently accepted medical use in treatment in the United States, their relative abuse potential, and likelihood of causing dependence when abused. 21 U.S.C. § 812.

13. Schedule II controlled substances are considered to have a high potential for abuse and which may lead to severe psychological or physical dependence. Levorphanol is an example of a Schedule II controlled substance.

14. Schedule III controlled substances are drugs with a moderate to low potential for physical and psychological dependence. Schedule III drugs' abuse potential is less than Schedule I and Schedule II drugs but more than Schedule IV. Phendimetrazine is an example of a Schedule III controlled substance.

15. The CSA and its implementing regulations establish controls and restrictions on the import, export, manufacture, and distribution of controlled substances. 21 U.S.C. § 801 *et seq.*; *id.* § 951 *et seq.*; 21 C.F.R. Part 1300 *et seq.* DEA is tasked with enforcing the CSA in a balanced manner that prevents the diversion of controlled substances from legitimate channels while ensuring their availability for legitimate medical purposes. 76 Fed. Reg. 39,318 (July 6, 2011).

16. Under the CSA, DEA can revoke, restrict, or suspend a registration upon one of five findings, including if the registrant has committed acts that render the registration inconsistent with the public interest. 21 U.S.C. § 824(a).

17. Prior to revoking or restricting a DEA registration, DEA must generally follow procedures designed to provide a registrant with notice and an opportunity to be heard. It must issue an order to show cause setting forth the basis for the agency's proposed action and providing the registrant with the opportunity to request a hearing. *See id.* § 824(c). At such a hearing, the government has the burden of proving by a preponderance of evidence that registration is inconsistent with the public interest. 21 C.F.R. § 1301.44(d).

18. DEA may issue an Immediate License Suspension Order of a DEA registration without providing a registrant with prior notice or an opportunity to respond to the allegations against it only if the continued registration poses an "imminent danger" to the public health and safety. The relevant statutory provision states:

> The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety. . . . A suspension under this subsection shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.

21 U.S.C. § 824(d)(1).

19. The governing DEA regulation specifies:

> The Administrator may suspend any registration simultaneously with or at any time subsequent to the service upon the registrant of an order to show cause why such registration should not be revoked or suspended, in any case where he/she finds that there is an imminent danger to the public health or safety. If the Administrator so suspends, he/she shall serve with the order to show cause pursuant to § 1301.37 an order of immediate suspension which shall contain a statement of his findings regarding the danger to public health or safety.

21 C.F.R. § 1301.36(e).

20. Upon suspending or revoking a DEA registration, DEA may place under seal any controlled substances in the registrant's possession. The relevant statutory provision states:

> In the event the Attorney General suspends or revokes a registration granted under section 823 of this title, all controlled substances or list I chemicals owned or possessed by the registrant pursuant to such registration at the time of suspension or the effective date of the revocation order, as the case may be, may, in the discretion of the Attorney General, be placed under seal.

21 U.S.C. § 824(f).

21. The regulations also provide that:

> [U]pon service of the order of the Administrator revoking or suspending registration, the registrant shall, as instructed by the Administrator: (1) Deliver all controlled substances in his/her possession to the nearest office of the Administration or to authorized agents of the Administration; or (2) Place all controlled substances in his/her possession under seal as described in sections 304(f) or 1008(d)(6) of the Act (21 U.S.C. 824(f) or 958(d)(6)).

5

21 C.F.R. § 1301.36(f).

22. Pursuant to 21 U.S.C. § 824(b), "[t]he Attorney General may limit revocation or suspension of a registration to the particular controlled substance . . . with respect to which grounds for revocation or suspension exist." Also, pursuant to 21 C.F.R. § 1301.36(g), DEA may limit the controlled substances placed under seal or to be delivered to DEA.

## FACTUAL BACKGROUND

23. Levorphanol is indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate. Levorphanol is a Schedule II controlled substance.

24. Phendimetrazine is indicated for the management of exogenous obesity as a short term adjunct (a few weeks) in a regimen of weight reduction based on caloric restriction in patients with an initial body mass index ("BMI") of greater than or equal to 30 kg/m$^2$ or greater than or equal to 27 kg/m$^2$ in the presence of other risk factors (e.g., controlled hypertension, diabetes, hyperlipidemia) who have not responded to appropriate weight reducing regimen (diet and/or exercise) alone. Phendimetrazine is a Schedule III controlled substance.

25. Virtus does not have a DEA registration because Virtus does not directly or physically manufacture or distribute any controlled substance—including levorphanol or phendimetrazine. More specifically, Virtus, as a "virtual" manufacturer, does not handle these or any controlled substances.

26. Virtus sells its levorphanol product primarily to direct purchasing pharmacies that dispense levorphanol pursuant to a prescription to patients that are in extreme pain and resistant to

other opioid pain medications. Likewise, Virtus sells its phendimetrazine to wholesalers that distribute phendimetrazine to pharmacies. Virtus distributes both levorphanol and phendimetrazine to such customers through Woodfield Distribution, LLC ("Woodfield") in Houston (specifically Sugar Land), Texas.

27. Woodfield is a distributor and a third-party logistics provider ("3PL") that performs supply chain operations including warehousing, storage, fulfillment, transportation management, temperature regulated environments, reverse logistics, and regulatory compliant product disposition. Woodfield maintains a DEA registration at facilities in both Houston, Texas and Boca Raton, Florida, to engage in the activities contracted by Virtus and other customers.

28. Woodfield's DEA registration number for the Houston distribution registration at issue here and pursuant to which Woodfield (as a 3PL) held and distributed drugs owned by Virtus is DEA No. RW0502218.

29. Woodfield also holds DEA registrations at its Boca Raton location. Woodfield's Boca Raton facility maintains the following DEA registrations: DEA Distributor (No. RW0407076), DEA Importer (No. RW0413548), DEA Exporter (No. RW0518932), and DEA 3PL Reverse Distributor (No. RW0433653).

30. Woodfield's Boca Raton DEA registrations are not affected by the immediate suspension orders ("ISOs") issued at the Houston location; thus, Woodfield is able to handle and distribute controlled substances from that location notwithstanding DEA's issuance of the ISOs at the Houston location.

31. On or around August 11, 2021, DEA served three ISOs on Woodfield at its Houston, Texas location. The ISOs are allegedly based on Woodfield's "failure to maintain effect [sic]

controls against the diversion of controlled substances and the imminent danger to public health and safety." *See* DEA, Press Release, *DEA Houston Serves ISO on Woodfield Pharmaceuticals & Distribution* (Aug. 11, 2021), https://www.dea.gov/press-releases/2021/08/11/dea-houston-serves-iso-woodfield-pharmaceuticals-distribution.

32. Upon information and belief, Virtus had no knowledge of any issues related to Woodfield's handling of Virtus's drug products, including its controlled substance drug products, that are stored at the Houston facility prior to DEA's service of the ISOs on Woodfield. Specifically, and upon information and belief, Virtus had—and currently has—no knowledge, understanding, or notice from Woodfield that its drugs were ever lost, stolen, or otherwise unaccounted for prior to DEA's service of the ISOs on Woodfield.

33. When it served the ISOs on Woodfield, DEA also seized and removed to an undisclosed location all controlled substances, including Virtus's levorphanol and phendimetrazine products that were being stored and distributed from Woodfield's Houston facility. DEA regulations provide that product can either be sealed at the facility or delivered to DEA for "safekeeping" because the facility's DEA registration is currently suspended.

34. On August 12, 2021, Virtus, through counsel, contacted DEA regarding the ISOs. DEA indicated that the ISOs concerned Woodfield, rather than Virtus. Counsel requested that DEA release to a DEA-registered distributor the levorphanol and phendimetrazine that belonged to Virtus. DEA, however, refused to release both Virtus's levorphanol and phendimetrazine so that desperate pain patients and patients treating their obesity would not have their treatment interrupted.

35. During the same August 12, 2021 communication with DEA, counsel for Virtus expressed its concerns that DEA may not be storing the levorphanol and phendimetrazine under

appropriate conditions required of drug products in accordance with the Federal Food, Drug, and Cosmetic Act. DEA informed counsel that the products were being stored in an undisclosed DEA warehouse under appropriate conditions.

36. Woodfield has acknowledged that Virtus maintains all right and title to Virtus's levorphanol and phendimetrazine products, and has expressly waived any claim to the Virtus controlled substance products that Woodfield maintained at the Houston facility.

37. Virtus has informed DEA that as of August 24, 2021, it has no more levorphanol inventory available to distribute to its customers. Moreover, even prior to DEA's current action and seizure of Virtus's levorphanol and phendimetrazine, Virtus projected a "stock out" situation for levorphanol in early 2022. Accordingly, Virtus, through its contract manufacturer, had submitted a request for supplemental quota to DEA on August 5, 2021, in order to maintain a continuous supply of levorphanol for patients suffering with debilitating chronic pain. As a result of DEA actions seizing Virtus product and the lack of additional quota from DEA to manufacture more product, Virtus is no longer able to supply this product to customers and patients and has no viable ability to manufacture for the foreseeable future.

38. Since the issuance of the ISOs to Woodfield, Virtus, through counsel, has made several requests to DEA requesting expedited review of the pending quota request. DEA has acknowledged the impact of the seizure of levorphanol, but has declined to provide clear guidance on the status of the pending supplemental quota request. However, even if DEA approves the pending quota request, Virtus will remain unable to supply patients suffering from debilitating chronic pain for at least an additional 150 days from the date of the quota approval due to the manufacturing lead time.

## **VIRTUS IS ENTITLED TO INJUNCTIVE RELIEF**

39. Virtus respectfully requests temporary, preliminary, and permanent injunctive relief to enjoin Defendants from maintaining their arbitrary and unlawful possession of both Virtus's levorphanol and phendimetrazine products that DEA seized from Woodfield's Houston, Texas facility.

40. DEA has never alleged that Virtus's levorphanol or phendimetrazine products are the subject of the ISOs directed to Woodfield. Indeed, DEA has affirmatively indicated that the ISOs concerned Woodfield, rather than Virtus.

41. Virtus understands and believes that DEA's basis for Woodfield's ISOs is likely due to Woodfield's "failure to maintain effect [sic] controls against the diversion of controlled substances and the imminent danger to public health and safety." *See* DEA, Press Release, *DEA Houston Serves ISO on Woodfield Pharmaceuticals & Distribution* (Aug. 11, 2021), https://www.dea.gov/press-releases/2021/08/11/dea-houston-serves-iso-woodfield-pharmaceuticals-distribution. It, therefore, serves no legitimate purpose for DEA to retain possession of Virtus's levorphanol or phendimetrazine products, and not permit Virtus to sell either drug through another DEA-registered distributor. Consequently, for the reasons explained below, all of the relevant factors for evaluating whether to issue injunctive relief overwhelmingly favor Virtus.

42. **Likelihood of Success.** DEA has the authority to place under seal controlled substances when suspending or revoking a DEA registration. 21 U.S.C. § 824(f). However, DEA also has the discretion to "limit revocation or suspension of a registration to the particular controlled substance or list I chemical with respect to which grounds for revocation or suspension exist." *Id.* § 824(b). This includes limiting the scope of an ISO.

10

43. DEA has unreasonably, arbitrarily, and capriciously failed and refused to use its discretion in this matter to limit the scope of any suspension under 21 U.S.C. § 824(b) and thereby, limit the product held under seal or, as the agency did in this case, to remove the controlled substances for safekeeping. 21 C.F.R. § 1301.36(g). Instead, DEA has arbitrarily and capriciously retained Virtus's levorphanol and phendimetrazine.

44. Continued retention of Virtus's levorphanol and phendimetrazine products is unnecessary because—as DEA admitted—DEA's underlying issues with Woodfield do not involve Virtus's ownership of levorphanol and phendimetrazine products.

45. Virtus, its customers and patients are but innocent bystanders and victims with regard to Woodfield's ISOs. Virtus is informed and believes that DEA has confirmed this fact, but has nevertheless arbitrarily insisted on retention of Virtus's levorphanol and phendimetrazine.

46. **Immediate Irreparable Harm.** Woodfield's Houston, Texas facility warehoused the overwhelming majority of Virtus's levorphanol and entire supply of phendimetrazine. Virtus supplies all of its levorphanol and phendimetrazine customers through Woodfield. Moreover, levorphanol and phendimetrazine comprise a significant portion of Virtus's business. Indeed, levorphanol comprises approximately 58% of Virtus's gross profits.

47. Levorphanol is dispensed to acutely ill pain patients including cancer patients, surgery patients, and hospice patients. Indeed, levorphanol is indicated in patients that have failed other opioid analgesics. For this reason, customers purchasing levorphanol from Virtus expect, and in fact require reliable and prompt delivery when levorphanol is needed. Virtus's customers include, for example, wholesalers and direct purchasing pharmacies.

48. Similarly, phendimetrazine is used in patients that are resistant to weight reduction regimens. Phendimetrazine is particularly important because obesity is the cause of many other chronic illnesses and treating obesity can prevent serious chronic health issues from developing, in particular during the COVID-19 pandemic.

49. Notably, despite losing patent exclusivity on phendimetrazine 105 mg ER, Virtus remains the only supplier of this product due in part to the difficult manufacturing process of the ER formulation. Virtus is one of only two current suppliers of phendimetrazine 35 mg IR.

50. In the absence of a temporary restraining order ("TRO"), DEA's actions have caused, and will continue to cause, serious disruption to both the levorphanol and phendimetrazine supply chain. Virtus understands and believes there is, and will continue to be, significant market shortages of levorphanol and phendimetrazine, resulting in delays in treatment for patients suffering from debilitating chronic pain and obesity. Specifically, based on available data, Virtus accounts for approximately 50% of the quota-constrained levorphanol 2 mg supply to patients, 100% of the phendimetrazine 105 mg ER supply to patients, and 40% of the phendimetrazine 35 mg IR supply to patients.

51. Moreover, unless the Court grants a TRO, pharmacies, wholesalers, and other customers that depend on a steady supply of levorphanol and phendimetrazine will switch to other suppliers and/or other drugs to treat patients. This will cause significant and continuing financial harm to Virtus because levorphanol and phendimetrazine comprise approximately 67% of Virtus's gross profits and will also lead to ongoing reputation harm.

52. Most of Virtus's customers receive levorphanol and phendimetrazine pursuant to negotiated agreements with those customers. Because Virtus is currently unable to supply customers with any of these products, customers will consider Virtus in breach of its

contractual supply obligations, exposing Virtus to additional and substantial financial harm and incalculable reputational harm.

53. With respect to financial harm, Virtus is subject to damages including those associated with lost sales from current business and financial penalties associated with contractually obligated supply level requirements. Additionally, Virtus is incurring unbudgeted manufacturing costs to attempt to limit disruption to patient supply as well as significant legal fees associated with this matter.

54. Any harm to Virtus, including but not limited to reputational harm, will also be irreparable because once a customer switches to another supplier of levorphanol or phendimetrazine, it is highly unlikely that they will return to Virtus.

55. Virtus has an established reputation of being able to provide continuous supply to customers. In fact, Virtus has previously won business by being able to step in when competitors have supply disruptions. Virtus will suffer further irreparable damage to its business reputation and loss of customer goodwill as a result of the seizure of products which caused an immediate, unresolved, and unplanned supply issue. In spite of its reputation, Virtus was unable to provide advanced notification to customers, leaving many with no immediate alternatives. Some customers will likely stop doing business with Virtus and never return.

56. Additionally, the unlawful retention of Virtus's levorphanol and phendimetrazine will cause Virtus to lose significant revenue that it will never recover. Virtus has no adequate remedy at law if this Court does not immediately enjoin DEA from arbitrarily and capriciously and unlawfully retaining its levorphanol and phendimetrazine products.

57. Without an immediate remedy from this Court, Virtus will be forced to enact a reduction in force of full-time employees due to imminent cash shortfall, be in breach of financial covenants with lenders due to lack of sales cash flow from levorphanol and phendimetrazine, and prepare for likely bankruptcy filings that may result in liquidation of the company.

58. Harm to Virtus is presently occurring and mounting daily because customers' needs for controlled substances are immediate due to "just-in-time" inventory management of controlled substances. Many of Virtus's customers place weekly or even more frequent or urgent orders with Virtus as patient demand arises. Additionally, patients are unable to wait for therapy especially due to the indication of levorphanol as being used to treat debilitating chronic pain for which alternative opioid analgesics have failed. These pharmacies will not receive deliveries of levorphanol if DEA retains possession of Virtus's product *because Virtus has no other supply of levorphanol.*

59. Indeed, these pharmacies may have difficulty purchasing levorphanol due to both the quota constrained supply as well as lack of pre-existing purchasing agreements with large wholesale distributors. With the loss of levorphanol, these pharmacies may also permanently lose patients who will likely move prescriptions to large national chain pharmacies. Small independent pharmacies are acutely sensitive to loss of patients as this correlates directly to a permanent loss of revenue.

60. Additionally, because Virtus's contract manufacturer has already used up all of the 2021 levorphanol procurement quota granted for 2021 and because DEA has not acted on Virtus's contract manufacturer's August 5, 2021 quota request seeking increased procurement quota of Virtus's levorphanol API (active pharmaceutical ingredient), it is at

this point in time impossible for Virtus to manufacture additional product to meet patients' or customers' needs.

61. **Balance of Hardships.**  The balance of hardships also supports issuing a TRO.  As explained above, DEA has admitted that its issues with Woodfield do not involve Virtus or Virtus's levorphanol or phendimetrazine products.  Indeed, DEA has never alleged that Virtus is in violation of any DEA rules/regulations or that Virtus's levorphanol or phendimetrazine poses an imminent danger to the public health.  DEA will not be harmed by the release of Virtus's products to another DEA-registered entity pending completion of the ISOs and show cause process concerning Woodfield.

62. DEA's actions in this matter are particularly troubling because Congress has granted DEA the discretion to limit its administrative seizures to particular controlled substances that are the subject of an DEA revocation or suspension notice.  21 U.S.C. § 824(b).  Similarly, regulations promulgated by DEA, authorize DEA to limit the removal or sealing of product to only that product impacted by any suspension or ISO.  21 C.F.R. § 1301.36(g).  This is the exact relief that Virtus has requested from DEA and now is requesting here.  DEA has arbitrarily and capriciously failed to exercise that statutory discretion in this matter.  Instead, DEA is punishing Virtus—who is not a DEA registrant in the first instance—for alleged regulatory violations committed by DEA registrant Woodfield.

63. DEA's actions are also extremely prejudicial to Virtus because Virtus is nothing more than an innocent bystander relative to DEA's investigation into Woodfield's Houston facility.  Virtus is bearing more hardship relative to Woodfield.  As stated above, Woodfield has a second DEA-registered facility, and a DEA registration suspension at one facility does not affect the other.  Therefore, for the most part, Woodfield can continue operating its business

as usual through its other DEA-registered location. Not so for Virtus. DEA knows (or should know) that its suspension of Woodfield's DEA registration is creating disproportionate hardships for Virtus and its customers. DEA, however, could release product to Virtus's chosen DEA-registered distributor pursuant to 21 U.S.C. § 824(b) and 21 C.F.R. § 1301.36(g) but has chosen to do nothing to alleviate these hardships.

64. Therefore, as described, Virtus is suffering, and will continue to suffer significant hardships, if DEA continues to unlawfully retain its levorphanol and phendimetrazine products. DEA, on the other hand, will suffer no hardship by releasing Virtus's levorphanol and phendimetrazine to another DEA-registered distributor to distribute the levorphanol and phendimetrazine to Virtus's customers.

65. **Public Interest.** Finally, the public interest weighs heavily in favor of granting a TRO. The retention of Virtus's levorphanol and phendimetrazine is not necessary to prevent any imminent harm to the public pursuant to DEA's ISOs. As noted above, Virtus's levorphanol is used in some of the sickest and most compromised patients and Virtus's phendimetrazine is used in exercise-resistant obesity. Continued arbitrary and unlawful retention of Virtus's levorphanol and phendimetrazine creates a lack of access to needed medications and causes injury to these same patients that depend on Virtus for an uninterrupted supply to meet their legitimate medical needs.

66. Accordingly, Virtus respectfully requests that the Court temporarily, preliminarily, and/or permanently enjoin DEA from retaining Virtus's levorphanol and phendimetrazine and order DEA to release such levorphanol and phendimetrazine to a DEA registrant until the Court can rule on a motion for a preliminary injunction to be filed by Virtus.

## CLAIM FOR RELIEF

### COUNT ONE
### Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2))

67. Virtus incorporates by reference all allegations contained in paragraphs 1 through 66.

68. The APA prohibits DEA from acting in a way that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or that is in excess of statutory jurisdiction or authority or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

69. Virtus is adversely affected and aggrieved by DEA's unlawful seizure—and retention—of its levorphanol and phendimetrazine products.  This is particularly true where DEA has admitted that the ISOs directed to Woodfield do not concern Virtus's levorphanol or phendimetrazine.

70. Defendants' decision to retain possession of Virtus's levorphanol and phendimetrazine is, therefore, arbitrary, capricious, and an abuse of discretion.

71. Defendants' decision to retain possession of Virtus's product is causing continuing irreparable harm.

### COUNT TWO
### Due Process

72. Virtus incorporates by reference all allegations contained in paragraphs 1 through 71.

73. DEA's seizure—and retention—of Virtus's levorphanol and phendimetrazine denied Virtus prior notice of any allegations against Woodfield or itself.  Virtus was also denied a meaningful opportunity to contest those allegations prior to DEA's seizure of its levorphanol and phendimetrazine.

74. Depriving Virtus of prior notice of allegations against Woodfield and the seizure of its levorphanol and phendimetrazine, and a meaningful opportunity to contest the seizure and

retention of its levorphanol and phendimetrazine was not necessary to further any governmental interest, significantly increased the prospect of an erroneous deprivation of Virtus's rights, and impaired the property interests of Virtus.

75. Accordingly, DEA's seizure and unlawful retention of Virtus's levorphanol and phendimetrazine is contrary to its constitutional rights, power, privilege, or immunity in violation of 5 U.S.C. § 706(2)(B).

## **REQUEST FOR RELIEF**

WHEREFORE, Virtus respectfully requests that this Court enter judgment in its favor and against the Defendants, as follows:

A. **DECLARE** that DEA's seizure and retention of Virtus's levorphanol and phendimetrazine is arbitrary and capricious and/or unlawful;

B. **ORDER** DEA to promptly release Virtus's levorphanol to a DEA-registered distributor;

C. **ENJOIN** DEA from further retaining possession of Virtus's levorphanol and phendimetrazine;

D. **AWARD** Virtus its costs and attorneys' fees; and

E. **AWARD** Virtus such other relief as the Court may deem just and proper.

Dated: August 31, 2021

Respectfully submitted,

By: */s/ Karla L. Palmer*
Karla L. Palmer (D.C. Bar No. 444353)
John A. Gilbert (D.C. Bar No. 448379)
Michael S. Heesters
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth Street NW, Suite 1200
Washington, D.C. 20005
(202) 737-5600 (phone)
(202) 737-9329 (fax)
kpalmer@hpm.com
jgilbert@hpm.com
mheesters@hpm.com

*Counsel for Virtus Pharmaceuticals LLC*