## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VIRTUS PHARMACEUTICALS, LLC<br> 2050 Cabot Blvd West, Suite 200<br> Langhorne, PA 19047 | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| MERRICK GARLAND, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

### VIRTUS PHARMACEUTICALS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Karla L. Palmer (D.C. Bar No. 444353)
John A. Gilbert (D.C. Bar No. 448379)
Michael S. Heesters
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth Street NW, Suite 1200
Washington, D.C. 20005
(202) 737-5600 (phone)
(202) 737-9329 (fax)
kpalmer@hpm.com
jgilbert@hpm.com
mheesters@hpm.com

*Counsel for Virtus Pharmaceuticals, LLC*

**TABLE OF CONTENTS**

TABLE OF CONTENTS                                                                    2

TABLE OF AUTHORITIES                                                                 3

INTRODUCTION                                                                         5

BACKGROUND                                                                           9

    I.      THE CONTROLLED SUBSTANCES ACT                                         9

    II.     LEVORPHANOL TARTRATE                                                 11

    III.    PHENDIMETRAZINE                                                      11

    IV.    VIRTUS                                                               12

    V.      WOODFIELD                                                           13

    VI.    ISOs SERVED ON WOODFIELD'S HOUSTON FACILITY                          14

LEGAL STANDARD                                                                      15

ARGUMENT                                                                            17

    I.      VIRTUS IS LIKELY TO SUCCEED ON THE MERITS.                           17

          A.    DEA Violated the APA Because DEA's Decision To Retain Virtus's Levorphanol and Phendimetrazine Is Arbitrary, Capricious, And An Abuse of Discretion.                                                17

          B.    DEA's Seizure of Virtus's Levorphanol And Phendimetrazine Is Unlawful.                                                            19

          C.    DEA Seizure and Refusal To Release Virtus's Levorphanol and Phendimetrazine Is Contrary To Virtus's Constitutional Rights.         20

    II.     VIRTUS IS SUFFERING, AND WILL CONTINUE TO SUFFER, IRREPARABLE HARM WITHOUT IMMEDIATE INJUNCTIVE RELIEF.   22

          D.    The Balance of Hardships Favors Immediate Injunctive Relief.         25

          E.    The Public Interest Favors Immediate Injunctive Relief.              25

CONCLUSION                                                                          26

## TABLE OF AUTHORITIES

**Cases**

*A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484 (D.C. Cir. 1995) ...................................................... 18

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)..................................................................... 16

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967)........................................................................... 15

*Barrow v. Graham*, 124 F. Supp. 2d 714 (D.D.C. 2000)........................................................... 16

*Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203 (D.D.C. 2012) ....................................... 21

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (1986)................................................................... 15, 16

*Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008) ....................................................... 25

*Frizelle v. Slater*, 111 F.3d 172 (D.C. Cir. 1997) ...................................................................... 18

*GE v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010) .................................................................... 20, 21

*Homer v. Roche*, 226 F. Supp. 2d 222 (D.D.C. 2002) ............................................................... 18

*John Doe, Inc. v. DEA*, 484 F.3d 561 (D.C. Cir. 2007)............................................................... 16

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................................ 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29 (1983)....................... 18

*Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8 (D.C. Cir. 2005) ....................................... 15

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)................................................................... 16

*Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62 (D.D.C. 2010) ...................................... 25

*Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010)................................................................. 25

*\*Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) ...................................... 24

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d
   75 (D.C. Cir. 2006) .................................................................................................................. 18

**Statutes**

21 U.S.C. § 824(a) ................................................................................................... 10

*21 U.S.C. § 824(b) .................................................................................... 6, 10, 17

21 U.S.C. § 824(c) .................................................................................................. 21

21 U.S.C. § 824(d) ........................................................................................ 8, 10, 19

21 U.S.C. § 824(d)(1) ...................................................................................... 10, 17

*21 U.S.C. § 824(f) ......................................................................................... 11, 17, 19

21 U.S.C. § 824(g) ......................................................................................... 11, 19

5 U.S.C. § 706(2)(A) .............................................................................................. 6

**Other Authorities**

21 C.F.R. § 1301.36(a)(2) ................................................................................... 10

*21 C.F.R. § 1301.36(c) ................................................................................. 10, 17

21 C.F.R. § 1301.36(e) ......................................................................................... 10

21 C.F.R. § 1301.36(f) ............................................................................... 11, 18, 19

21 C.F.R. § 1301.36(g) .................................................................................. passim

21 C.F.R. § 1301.36(h) ................................................................................... 10, 17

21 C.F.R. § 1303.12 .............................................................................................. 13

**\*Authorities upon which Plaintiff chiefly relies are marked with asterisks.**

**INTRODUCTION**

This lawsuit seeks immediate injunctive relief that will enjoin the U.S. Drug Enforcement Administration ("DEA") from unlawfully retaining Virtus Pharmaceuticals, LLC's ("Virtus") levorphanol and phendimetrazine drug products.  DEA unlawfully seized Virtus's drugs when it served Immediate Suspension Orders ("ISOs") on Woodfield Distribution, LLC's ("Woodfield") Houston, Texas facility.  This seizure is particularly egregious because DEA's ISOs concerned only Woodfield—not Virtus.  Schumacher Decl. ¶ 3.  Despite this admission, DEA has taken the extraordinary step of seizing—and ***refusing to release***—Virtus's levorphanol and phendimetrazine.

DEA's actions have caused Virtus significant, immediate, and irreparable harm regarding its sales and distribution of both levorphanol and phendimetrazine—which is catastrophic to its continued business.  Specifically, DEA's action has and will continue to result in the loss of tens of millions of dollars, the loss of customers, and the loss of goodwill and its reputation that Virtus can never recover—and this does not even account for the patients that DEA is putting at risk. Smith Decl. ¶¶ 34-41.  The Court's intervention is, therefore, immediately necessary to minimize Virtus's mounting irreparable injury.

As explained more fully below, examination of all of the relevant factors shows that Virtus is entitled to a temporary restraining order ("TRO") enjoining DEA from retaining Virtus's levorphanol and phendimetrazine drug products.

**<u>Likelihood of Success.</u>**  Virtus is likely to succeed on the merits with regard to their challenge to DEA's unlawful seizure and retention of its levorphanol and phendimetrazine.  Virtus is an innocent bystander in this matter that is being punished for the alleged indiscretions of

5

another.  DEA served ISOs on Woodfield—not Virtus.  DEA has confirmed that the ISOs are not directed at the sale or distribution of Virtus's levorphanol and phendimetrazine to customers or Virtus's conduct.  Schumacher Decl. ¶ 3.  DEA is also aware that Virtus is the owner of the levorphanol and phendimetrazine seized from Woodfield.  *Id.* ¶¶ 3-4; Smith Decl. ¶ 4.  Indeed, Woodfield has signed a "Waiver of Rights and Interests" specifically addressing the levorphanol and phendimetrazine at issue.  Exhibit A.  Moreover, Virtus has another DEA-registered distributor ready and willing to accept its levorphanol and phendimetrazine.  DEA is aware of these facts, yet will not release Virtus's products.  This conduct is arbitrary, capricious and an abuse of discretion at the outset.  5 U.S.C. § 706(2)(A).

Congress granted DEA the discretion to limit revocation or suspension orders to particular controlled substances at issue.  21 U.S.C. § 824(b).  DEA has affirmatively indicated that their investigation is targeted at Woodfield's regulatory compliance failures.  Schumacher Decl. ¶ 3.  It stands to reason, therefore, that Virtus's levorphanol and phendimetrazine drug inventory are not at issue with respect to Woodfield's ISOs—particularly so where, as here, Virtus can and will distribute these drugs to their customers through another appropriately licensed and DEA-registered distributor.  Again, DEA has the statutory authority to resolve this matter in a way that will prevent the certain demise and bankruptcy of an innocent bystander and protect patients by maintaining access to needed medications.  DEA, however, refuses to do so and has failed to provide any reasoned response why not.

**Irreparable Harm.**  A TRO is required to prevent the immediate, ongoing, and irreparable harm to Virtus.  Virtus fully stocked out of supply of levorphanol on August 24, 2021 and has no ability to restock the product without additional quota being approved by DEA; DEA has not acted on a pending request for additional quota that was submitted August 5, 2021.  Immediately

following the ISO, Virtus experienced a two-week stockout of phendimetrazine.  Virtus was able

to release work-in-progress product and resume shipment of certain configurations on August 24,

2021, on an allocation basis to a limited set of customers.  Virtus expects to remain stocked out of

three of five packaging configurations of phendimetrazine for the foreseeable future.  Virtus will

lose those current customers who need to have prescriptions for these controlled substance

prescriptions filled.  Smith Decl. ¶¶ 34-36, 39.  Virtus relies on strategies such as a continuous

supply chain to win and maintain business relationships in the first instance.  DEA's seizure of the

supply of the majority of the controlled substance products offered by Virtus has and will continue

to damage its reputation in the industry because it cannot deliver on its contractual promises or

meet its supply obligations, which had been a hallmark of its business success.  *Id.* ¶ 36.  Virtus

provided notification to FDA of the shortage of levorphanol on August 27, 2021.  *Id.* ¶ 19.

Virtus risks irreparable financial sustainability and harm to the business as a result of

DEA's ISO and seizure of its products, which also contributes to serious reputational harm.

Specifically, DEA's actions will cause Virtus to be in breach of contractual covenants with its

customers that cannot be remedied unless an injunction is issued.  *Id.* ¶ 34.  This is also particularly

devastating to the continuation of Virtus's business because levorphanol represents approximately

58% of gross profits and phendimetrazine represents 9% of gross profits.  *Id.* ¶ 33.  There are other

financial consequences in addition to the revenue lost as a result of Virtus's inability to sell

levorphanol and phendimetrazine, including but not limited to breaches of financial covenants with

creditors and lenders.  *Id.* ¶ 42.

Patients will also be harmed by DEA's actions.  Levorphanol and phendimetrazine are

both indicated for treatment-resistant patients.  Failure to maintain adequate drug supply to these

patients may result in adverse health consequences.  The need to maintain the supply of

levorphanol is particularly acute because it is used in some of the sickest patients in need of pain therapy. Specifically, levorphanol is used in cancer and hospice patients that have failed other opioid pain therapy. Smith Decl. ¶¶ 5, 12, 13. It is not an exaggeration that DEA's unlawful actions in this matter put many of these patients in danger.

Small independent local pharmacies will also be harmed by DEA's action. Virtus is the exclusive supplier of levorphanol to a network of 31 specialty pharmacies across the country, all of which are community-based small businesses that are not owned by large national chain pharmacies. As a result of DEA's seizure of product, many of these pharmacies no longer have access to levorphanol to serve their chronically ill patients as they do not have pre-existing buying agreements with large wholesale distributors. With the loss of levorphanol, these pharmacies may also permanently lose patients who will likely move prescriptions to large national chain pharmacies. Small independent pharmacies are acutely sensitive to loss of patients as this correlates directly to a permanent loss of revenue.

**Public Interest.** A TRO serves the public interest. DEA's retention of Virtus's levorphanol and phendimetrazine products is not necessary to prevent any imminent harm to the public. As confirmed by DEA, Woodfield's ISOs do not involve Virtus's levorphanol and phendimetrazine. Thus, DEA has not—and cannot—allege that *Virtus's* levorphanol and phendimetrazine pose "an imminent danger to the public health or safety," 21 U.S.C. § 824(d), especially considering Virtus's requests that the product be immediately transferred to the possession of another DEA registrant. And, as previously stated, Virtus's levorphanol is used in some of the sickest and most compromised patients, and Virtus's phendimetrazine is used in exercise-resistant obesity. It is, therefore, in the public interest to release these drugs to ensure that these patients continue to enjoy an uninterrupted supply of these drugs for their legitimate

medical needs.

**Balance of the Hardships.**  The balance of the equities favors the issuance of a TRO. DEA, as a federal agency, cannot credibly argue that it will suffer hardship if ordered to act in a way that comports with the law by releasing Virtus's levorphanol and phendimetrazine so that it can be immediately transferred to another DEA-registered facility.  Virtus, however, is already suffering significant hardships in terms of its near catastrophic monetary, reputational, and other harms.

The Court should immediately enjoin DEA from its unlawful, arbitrary, and capricious retention of Virtus's levorphanol and phendimetrazine drug products.

**BACKGROUND**

## I.    THE CONTROLLED SUBSTANCES ACT

The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.*, is the federal U.S. drug policy under which the manufacture, importation, possession, use, and distribution of certain narcotics, stimulants, depressants, hallucinogens, anabolic steroids, and other chemicals are regulated.  It places these substances into one of five schedules (i.e., I – V) based on a substance's medical use, potential for abuse, and safety or dependence liability.   In particular, Schedule II controlled substances are considered to have a high potential for abuse which may lead to severe psychological or physical dependence.  Schedule III controlled drugs are drugs with a moderate to low potential for physical and psychological dependence.  Schedule III drugs' abuse potential is less than Schedule I and Schedule II drugs but more than Schedule IV.

DEA implements the CSA and may prosecute violators of these laws at both the domestic and international level.  Individuals who order, handle, store, and distribute controlled substances

must be registered with DEA at specific facilities and locations to perform these functions.  DEA registrants must maintain accurate inventories, records, and security of controlled substances.

The CSA authorizes DEA to revoke, restrict, or suspend a DEA registration only under certain limited circumstances.  DEA can revoke or suspend a registration only upon a finding that the registrant has:  (1) materially falsified an application for DEA registration; (2) a prior felony conviction under Federal or State laws related to controlled substances or listed chemicals; (3) had an applicable state professional license revoked or suspended; (4) committed such acts as to render the registration inconsistent with the public interest; or (5) been subject to mandatory exclusion from participation in federal Medicare programs pursuant to 42 U.S.C. § 1320a-7(a).  *See* 21 U.S.C. § 824(a); *see also* 21 C.F.R. § 1301.36(a)(2).  Moreover, DEA can only pursue the extraordinary remedy of an immediate suspension, that is an ISO, based on an "imminent danger to public health and safety."  21 U.S.C. § 824(d); *see also* 21 C.F.R. § 1301.36(e).  DEA has taken this extraordinary action against Woodfield.  *See* Exhibit B (DEA, Press Release, *DEA Houston Serves ISO on Woodfield Pharmaceuticals & Distribution* (Aug. 11, 2021), https://www.dea.gov/press-releases/2021/08/11/dea-houston-serves-iso-woodfield-pharmaceuticals-distribution).  (Noting also that Woodfield has failed "to maintain effect [sic] controls against the diversion of controlled substances.").

The CSA provides that DEA has the discretion to "limit revocation or suspension of a registration to the particular controlled substance . . . with respect to which grounds for revocation or suspension exist."  21 U.S.C. § 824(b); 21 C.F.R. § 1301.36(c).  More importantly, even in the case of an ISO, DEA regulations state that DEA can limit the suspension "to a particular controlled substance or substances."  21 C.F.R. § 1301.36(g).  DEA can also withdraw the suspension at any time.  21 U.S.C. § 824(d)(1); 21 C.F.R. § 1301.36(h).  The CSA also gives DEA discretion to ***place***

*under seal* controlled drugs owned or possessed by a registrant upon suspension or revocation of the registrant's DEA registration.  21 U.S.C. § 824(f).  Upon issuing an ISO, wherein the authority to handle controlled substances at the facility is suspended, DEA can either (i) require the delivery of all controlled substances in the registrant's possession to authorized DEA agents or (ii) place under seal at the registrant's facility all controlled substances.  21 C.F.R. § 1301.36(f).  Moreover, in the case where the ISO is limited to only certain controlled substances, the registrant would be required to only deliver to DEA agents or place under seal, certain controlled substances subject to the suspension.  *Id.* § 1301.36(g).  Finally, DEA is only authorized to *"seize"* a controlled substance where a registrant's registration "has expired or who has ceased to practice or do business in the manner contemplated by his registration."  21 U.S.C. § 824(g).

## II.     LEVORPHANOL TARTRATE

Virtus is the owner of Abbreviated New Drug Application ("ANDA") 211484 for levorphanol tartrate 2 mg tablets ("levorphanol").  Levorphanol is classified as a Schedule II controlled substance.  Levorphanol is indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate.

Levorphanol is generally used by palliative care doctors and other pain specialists to treat patients that cannot tolerate, or who have failed, other pain management therapy.  Levorphanol is used to treat some of the sickest patients, including cancer and/or hospice patients.

## III.    PHENDIMETRAZINE

Virtus is also the owner of ANDA 85588 for phendimetrazine 35 mg immediate release tablets, and New Drug Application ("NDA") 18074 105 mg extended-release capsules (collectively, "phendimetrazine").  Phendimetrazine is a Schedule III controlled substance.

Phendimetrazine is indicated for the management of exogenous obesity as a short term adjunct (a few weeks) in a regimen of weight reduction based on caloric restriction in patients with an initial body mass index ("BMI") of greater than or equal to 30 kg/m$^2$ or greater than or equal to 27 kg/m$^2$ in the presence of other risk factors (e.g., controlled hypertension, diabetes, hyperlipidemia) who have not responded to appropriate weight reducing regimen (diet and/or exercise) alone.

Phendimetrazine is, therefore, an anti-obesity drug that is indicated for patients that have not responded to other weight loss measures.   Phendimetrazine is chemically related to amphetamines and acts as an appetite suppressant.

## IV.   VIRTUS

Virtus is an established small, privately held pharmaceutical company that develops and sells drugs to customers, including wholesalers and pharmacies.  Virtus sells both controlled and non-controlled drugs.  Both levorphanol and phendimetrazine are controlled drugs.  As a "virtual" manufacturer, Virtus outsources all manufacturing, packaging, shipping, storage, distribution, and reverse logistics for all of its products.  Smith Decl. ¶¶ 3, 6.  Virtus also does not physically handle any drug products, including controlled substances.  *Id.* ¶¶ 6-8.  Therefore, Virtus does not maintain, and is not required to maintain, its own DEA registration.  Virtus must enter into contracts with other companies to manufacture and distribute its drugs.  Woodfield, a drug distributor and third-party logistics provider, is one of those companies.

Approximately 50% of the levorphanol 2 mg on the U.S. market is supplied by Virtus.  *Id.* ¶ 12.  Virtus is also the exclusive levorphanol supplier to a network of 31 specialty/mail order pharmacies across the country that may no longer have access to Virtus's levorphanol product because of DEA's action.  *Id.* ¶ 18.  Virtus ran out of its levorphanol supply on August 24, 2021. Virtus cannot have more levorphanol manufactured because Virtus's contract manufacturer does

not currently have any remaining procurement quota for 2021 from DEA to manufacture additional levorphanol.[1]  Moreover, DEA has not acted on a pending request for additional quota by the manufacturer.  Specifically, Virtus's contract manufacturer submitted a supplemental quota request to DEA on August 5, 2021 to support the manufacturing of additional product but DEA has yet to approve this request.  It is, therefore, impossible for Virtus to remedy this situation by having more levorphanol manufactured.[2]  Thus, DEA has Virtus stuck between the proverbial rock and a hard place.

Virtus is the only market supplier of phendimetrazine extended release ("ER") 105 mg. Smith Decl. ¶ 25.  This is due to an extremely difficult manufacturing process of the ER formulation.  Virtus is also one of only two active suppliers of phendimetrazine 35 mg immediate release ("IR") and supplies approximately 40% of the market.  *Id.* ¶ 26.  Currently, Virtus has a limited supply of phendimetrazine and is unable to supply a significant portion of the market.  *Id.* ¶ 28.  Virtus has already experienced a "stock out" of levorphanol and expects to face additional "stock outs" of both phendimetrazine products in the next several weeks due to the long manufacturing lead up time.  *Id.* ¶¶ 28, 29.

## V.    WOODFIELD

Woodfield is a distributor and third-party logistics ("3PL") provider that performs supply

---

[1]  Because levorphanol is a Schedule II substance, any manufacturer of finished dosage forms must apply for and obtain an annual procurement quota from DEA to obtain active pharmaceutical ingredient ("API") and make the finished dosage forms.  21 C.F.R. § 1303.12.  The manufacturer may not exceed the amount granted by DEA.

[2]  Even if DEA were to approve this supplemental quota request, it would take at least 150 days to procure API, complete manufacturing, package product, and perform required release testing to ensure the safety, quality, efficacy, and compliance of the product for use by patients.  Smith Decl. ¶ 21.

chain operations including warehousing, storage, fulfillment, transportation management, temperature regulated environments, reverse logistics, and regulatory-compliant product disposition.  Woodfield maintains facilities in both Houston (Sugar Land), Texas and Boca Raton, Florida.  Both of these facilities maintain separate and distinct DEA registrations.  Because Woodfield is the entity and facility that physically handles the controlled substances, they are required to be registered with DEA to distribute the levorphanol and phendimetrazine owned by Virtus.  Woodfield's DEA number for the Houston distribution registration at issue here and pursuant to which Woodfield (as a 3PL) held and distributed drugs owned by Virtus is DEA No. RW0502218.

Virtus is a customer of Woodfield and contracts with Woodfield for third-party logistics services, including inventory management, warehousing, storage, order-processing, product quarantine, distribution, handling, and shipment of controlled and non-controlled substances.  *Id.* ¶ 7.  Virtus retains title of all product at all times while under storage at Woodfield.  *Id.* ¶ 8.

## VI.    ISOs SERVED ON WOODFIELD'S HOUSTON FACILITY

On or about August 11, 2021, DEA served three ISOs on Woodfield's Houston, Texas facility.  Woodfield's other Boca Raton, Florida facility's DEA registration was unaffected by DEA's ISOs.  When serving the ISOs on Woodfield's Houston facility, rather than availing itself of the option to seal all of the controlled substances at the facility, DEA removed the product to an undisclosed location including Virtus's levorphanol and phendimetrazine products that were being stored and distributed from Woodfield's Houston facility.  DEA allegedly has in its possession what amounts to approximately 62,396 units of Virtus's saleable controlled substances valued at approximately \$37.3 million.  *Id.* ¶ 10.

Subsequent to DEA's actions, Virtus contacted DEA on or about August 12, 2021 to

inquire whether Woodfield's ISOs concerned Virtus.  Schumacher Decl. ¶ 3; LaMagna Decl. ¶ 4.
DEA indicated that Woodfield's ISOs did not involve Virtus or any of its actions.  Schumacher
Decl. ¶ 3; Smith Decl. ¶ 30.  More importantly, DEA expressed no concern in regard to the
levorphanol or phendimetrazine product at Woodfield's Houston facility.  Nevertheless, DEA
refused to release both Virtus's levorphanol and phendimetrazine to another DEA-registrant,
leaving Virtus and its customers with virtually no product to supply to either treat patients or
continue its business operations.  Smith Decl. ¶¶ 18, 28-29, 38.

On August 25, 2021, Woodfield signed a "Waiver of Rights and Interests" where
Woodfield has acknowledged that Virtus, and not Woodfield, maintains all right and title to the
products.  Woodfield also expressly waived any claim to Virtus' levorphanol and phendimetrazine
products that Woodfield maintained at the Houston facility.  Exhibit A.

## LEGAL STANDARD

DEA's action in removing Virtus's products, essentially amounts to a ***seizure*** and its
subsequent failure to release Virtus's levorphanol and phendimetrazine is agency conduct
cognizable under the APA.  To evaluate the finality of an agency decision, a two-part test is
employed:  (1) the action under review must mark the consummation of the agency's decision
making process—it must not be of a merely tentative or interlocutory nature; (2) the action must
be one by which rights or obligations have been determined, or from which legal consequences
will flow.  *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (citations and
internal quotation marks omitted).   The Supreme Court has instructed that this "finality
requirement" be applied in a "'flexible' and 'pragmatic way.'"  *Ciba-Geigy Corp. v. EPA*, 801
F.2d 430, 435 (1986) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 149-50 (1967)).  When
analyzing finality, the court analyzes "primarily to whether the agency's position is 'definitive'

and whether it has a 'direct and immediate effect on the day-to-day business' of the parties challenging the action." *John Doe, Inc. v. DEA*, 484 F.3d 561, 566 (D.C. Cir. 2007) (citing *Ciba-Geigy Corp.*, 801 F.2d at 436).   This is precisely why DEA's actions in this case fall squarely within the reviewability standard of the APA.   Specifically, after DEA seized Virtus's drug products from Woodfield, DEA was contacted multiple times by Virtus's representatives, and each time DEA refused to release the drugs owned by Virtus and for which DEA had indicated no concern related to its ISOs in its communications with Virtus's counsel.   Schumacher Decl. ¶ 3. However, the CSA and implementing regulations clearly provide DEA with authority and discretion to limit an ISO and limit the controlled substances to be placed under seal or taken for "safekeeping."   Even after Woodfield disclaimed any property interest in the drugs, DEA still refused to modify its ISOs to exclude product belonging to Virtus even though DEA has not alleged any issues related to the legitimate sale and distribution of these products to Virtus' customers.   *Id.* Moreover, as described in the Complaint and this brief, Virtus is experiencing direct, immediate and ongoing effects on its day-to-day business.   Smith Decl. ¶¶ 32-42.   These effects may cause Virtus to declare bankruptcy in the very near future.   *Id.* ¶ 42.

Virtus is entitled to a TRO enjoining DEA from retaining Virtus's levorphanol and phendimetrazine products.   The purpose of a TRO is to protect against irreparable injury and to preserve the status quo until the Court can render a meaningful decision on the merits.   *Barrow v. Graham*, 124 F. Supp. 2d 714, 715-16 (D.D.C. 2000).   Under the traditional test, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."   *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).   Virtus readily meets all

four prongs of this standard.

As explained below, all four factors compel the issuance of a TRO in this case.  Most critically, Virtus's business and its customers and patients that depend on Virtus's levorphanol and phendimetrazine are currently being harmed.  Moreover, release of Virtus's levorphanol and phendimetrazine to another DEA-registered distributor will not cause an imminent danger to the public health or safety because—as DEA stated—the ISOs are unrelated to Virtus's conduct or the ultimate sale and distribution of Virtus's products to customers.

## ARGUMENT

## I.   VIRTUS IS LIKELY TO SUCCEED ON THE MERITS.

### A.   DEA Violated the APA Because DEA's Decision To Retain Virtus's Levorphanol and Phendimetrazine Is Arbitrary, Capricious, And An Abuse of Discretion.

The CSA and DEA's regulations plainly state that "[t]he Administrator may limit the revocation or suspension of a registration to the particular controlled substance . . . with respect to which grounds for revocation or suspension exist." 21 C.F.R. § 1301.36(c); 21 U.S.C. § 824(b). More importantly, even in the case of an ISO, DEA can limit the suspension "to a particular controlled substance or substances."  21 C.F.R. § 1301.36(g).  DEA can also withdraw the suspension at any time. 21 U.S.C. § 824(d)(1); 21 C.F.R. § 1301.36(h).  It would also reason that DEA could also modify the suspension as necessary.  The CSA gives DEA discretion to place under *seal* controlled drugs owned or possessed by a registrant upon suspension or revocation of the registrant's DEA registration. 21 U.S.C. § 824(f).  Upon issuing an ISO, wherein the authority to handle controlled substances at the particular facility is suspended, DEA can either (i) require the delivery of all controlled substances in the registrant's possession to authorized DEA agents

or (ii) place under seal at the registrant's facility all controlled substances. 21 C.F.R. § 1301.36(f). In the case where the ISO is limited to only certain controlled substances, the registrant would be required to only deliver to DEA agents or place under seal, certain controlled substances subject to the suspension. *Id.* § 1301.36(g).

Here, DEA has stated that Woodfield's ISOs do not concern Virtus conduct or the sale and distribution of products to its customers. Schumacher Decl. ¶ 3; s*ee also* Smith Decl. ¶ 30. DEA has also failed to provide any reasoned basis for its continued retention of Virtus's levorphanol and phendimetrazine product at an undisclosed location and is, therefore, owed no deference concerning its decision. *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 83 (D.C. Cir. 2006) ("[W]here an agency has articulated *no reasoned basis for its decision* . . . we will not 'abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence.'") (citations omitted; emphasis added); *see id.* ("Because [the agency] has articulated no satisfactory explanation for its action including a rational connection between the facts found and the choice made, it is owed no deference for the action taken in this case on this record.") (internal citation and quotation marks omitted).[3] DEA's actions are, therefore, arbitrary and capricious, and Virtus is likely to prevail based on this fact alone.

---

[3] *See also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29 (1983); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995) ("'[A]n agency must cogently explain why it has exercised its discretion in a given manner,' and that explanation must be 'sufficient to enable us to conclude that the [agency's action] was the product of reasoned decisionmaking.'") (internal citation omitted); *Homer v. Roche*, 226 F. Supp. 2d 222, 226-27 (D.D.C. 2002) (When an agency's reasoning is "entirely opaque," it has not provided the requisite "'rational connection between the facts found and the choice made.'") (citing *Frizelle v. Slater*, 111 F.3d 172, 176-77 (D.C. Cir. 1997)).

**B.      DEA's Seizure of Virtus's Levorphanol And Phendimetrazine Is Unlawful.**

The CSA gives DEA discretion to ***place under seal*** controlled drugs owned or possessed by a registrant upon suspension or revocation of the registrant's DEA registration.  21 U.S.C. § 824(f).  As previously stated, upon issuing an ISO, wherein the authority to handle controlled substances at the facility is suspended, DEA can either (i) require the delivery of all controlled substances in the registrant's possession to authorized DEA agents or (ii) place under seal at the registrant's facility all controlled substances.  21 C.F.R. § 1301.36(f).  In the case where the ISO is limited to only certain controlled substances, the registrant would be required to only deliver to DEA agents or place under seal, certain controlled substances subject to the suspension.  *Id.* § 1301.36(g).

DEA may ***seize*** controlled substances only where a registrant's registration "has expired or who has ceased to practice or do business in the manner contemplated by his registration."  21 U.S.C. § 824(g).  Woodfield is still in business and intends to conduct business "in a manner contemplated by [its DEA] registration."  Indeed, Woodfield's Boca Raton facility is still in operation with a valid DEA registration.  Woodfield's registration also has not "expired," and the company has not "ceased to practice or do business," *id.*, permitting the "seizure" of controlled substances, does not, therefore, apply.

In this matter, DEA exercised its authority to immediately suspend Woodfield's registration pursuant to 21 U.S.C. § 824(d).  This is apparent because DEA has publicly characterized the basis for Woodfield's ISO as its "failure to maintain effect [sic] controls against the diversion of controlled substances and the imminent danger to public health and safety."  *See* Exhibit B.

However, DEA's removal of Virtus's product to an undisclosed location and refusal to

modify the ISOs by releasing these products is a *seizure* of Virtus's levorphanol and phendimetrazine.  The clear intent of the procedures provided in DEA regulations related to the seal or removal for safekeeping of products pursuant to an ISO are primarily because the facility temporarily does not have the authority to handle these products because of the suspension.  These same regulations also contemplate limiting the seal or removal as to only those products which are directly related to the allegations that are the basis for the ISO.  Here, by DEA's own admission, neither Virtus, nor the distribution and sale of its products to customers are the basis for DEA's allegations or actions involving Woodfield.  Schumacher Decl. ¶¶ 3, 6.  The revocation and suspension scheme contemplated by Congress under the CSA, and DEA's own regulations, do not permit a seizure in this case.  Seizure is only permitted pursuant to 21 U.S.C. § 824(g).  DEA, therefore, unlawfully—and arbitrarily and capriciously—failed to follow the clear intent of the CSA and DEA regulations, amounting to a seizure of Virtus's levorphanol and phendimetrazine.  DEA's *seizure* and refusal to release Virtus's products, on its face, is unlawful.

   **C.    DEA Seizure and Refusal To Release Virtus's Levorphanol and Phendimetrazine Is Contrary To Virtus's Constitutional Rights.**

   DEA's seizure and unlawful retention of Virtus's levorphanol and phendimetrazine is contrary to Virtus's constitutional rights because it violates due process.  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'  Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process."  *GE v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (citation omitted).  In this case it is indisputable that DEA retains possession of Virtus's levorphanol and phendimetrazine.  "Proceeding to step two, there is a well-recognized principle that due process permits [the government] to take summary administrative action without pre-deprivation process, but subject to a prompt post-deprivation hearing, where such action is needed

20

to protect public health and safety." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 229 (D.D.C. 2012) (internal citations and quotation marks omitted). Moreover, "[a]t this second step, we apply [a] . . . balancing test, considering (1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and 'the probable value, if any, of additional or substitute procedural safeguards.'" *GE v. Jackson*, 610 F.3d at 117 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). This balancing test tips in favor of Virtus.

First, as described throughout this brief, Virtus's property interest in its levorphanol and phendimetrazine is enormous. Access to these drugs is vital to both Virtus's survival as a company and Virtus's ability to distribute the drugs to the patients who depend on them. Smith Decl. ¶¶ 5, 12, 13, 15-18, 24-29, 32-42. Second, while DEA has an interest in this property by virtue of its suspension of ***Woodfield's*** authority to handle controlled substances, DEA's primary interest is directed at Woodfield's alleged misconduct related to compliance with the CSA and DEA regulations, including recordkeeping and reporting requirements. Yet, the property at issue— levorphanol and phendimetrazine—is owned by Virtus. Third, Virtus is requesting to take possession of its seized drugs and send them to another DEA registrant with a valid registration. This is a simple and obvious safeguard available to protect both DEA's interest in keeping these controlled drugs out of Woodfield's Houston facility, while at the same time allowing Virtus to carry on its business and supply patients who need access to their medication. It is clear, therefore, that Virtus's constitutional rights have been violated, and there is a remedy available that serves Virtus's interest, as well as, the public interest and DEA.

Also, unlike Woodfield, which as a DEA registrant is provided with certain post-deprivation rights under the CSA and its implementing regulations, (*see, e.g.*, 21 U.S.C. § 824(c); 21 C.F.R. § 1301.36(h); 21 C.F.R. §§ 1316.41-.68). Virtus, an innocent third party, is afforded no

such rights, or even options under the CSA or its implementing regulations.  In short, Virtus has no post-deprivation rights or actions, access to an immediate hearing, or an appeal to the DEA Administrator to challenge the ISOs or any related action.  Thus, DEA's actions are arbitrary and capricious, and this Court should rectify this striking lack of due process.

## II.   VIRTUS IS SUFFERING, AND WILL CONTINUE TO SUFFER, IRREPARABLE HARM WITHOUT IMMEDIATE INJUNCTIVE RELIEF.

The detrimental effects that Virtus is suffering, and will continue to suffer, in the absence of emergency relief from this Court are significant.  If this Court allows DEA to continue its unlawful seizure and retention of Virtus's levorphanol and phendimetrazine, then Virtus will continue to suffer severe negative and indeed irreparable consequences on several levels.

Virtus supplies approximately 50% of the levorphanol market in the United States.  Smith Decl. ¶ 12.  Levorphanol also comprises 58% of Virtus's gross profits.  *Id.* ¶ 33.  Together, the levorphanol and phendimetrazine products seized by DEA represent approximately 67% of Virtus's total annual gross profits.  *Id.*  Virtus supplied ***all*** of its levorphanol and phendimetrazine customers through Woodfield's Houston facility.  Virtus also cannot simply "order more" levorphanol to be manufactured.  This is because Virtus's contract manufacture has already exhausted the 2021 levorphanol procurement quota authorized by DEA and has no remaining inventory and DEA has not yet approved this same contract manufacturer's request to increase its 2021 levorphanol procurement quota that it submitted on August 5, 2021, thus only increasing the harm to patients and Virtus.  *Id.* ¶ 21.  Virtus's phendimetrazine has a long lead time of up to 120 days and likely will not receive newly manufactured product prior to another stock out situation occurring.  *Id.*

Virtus has completely exhausted all of its levorphanol supply.   *Id*. ¶ 15.  DEA's refusal to

release Virtus's product is having a devastating impact on Virtus's business.  *Id.* ¶¶ 41-42.  There is, however, much more at stake.

Levorphanol is dispensed and administered by medical practitioners to some of the most acutely ill pain patients including cancer patients, surgery patients, and hospice patients.  Indeed, levorphanol is indicated in patients that have failed other opioid analgesic options, such as oxycodone and morphine.  *Id.* ¶ 13.  It is for this reason that levorphanol is often used as a medication of last resort.  *Id.* ¶ 12.  For this reason, customers purchasing levorphanol from Virtus expect and in fact require reliable and prompt delivery when levorphanol is needed.  ***To reiterate, 50% of the levorphanol is no longer available to the cancer, hospice, and other intractable pain patients that depend on this drug as a treatment of last resort.***  *Id.* ¶ 12.  At the current time, Virtus can do nothing to help these patients because DEA has retained its medication supply notwithstanding a lack of either culpability or wrongdoing by Virtus.  Consequently, Virtus's strong reputation and goodwill earned after years of business is being irreparably damaged, and it stands to suffer tens of millions of dollars of financial losses, including bankruptcy if DEA's actions are not enjoined by this Court.  *Id.* ¶¶ 32, 34-42.

Virtus's loss of goodwill is manifesting itself through contractual disputes with its customers.  *Id.* ¶¶ 34-35.  Specifically, Virtus has contractually obligated service level commitments to customers; and since DEA's seizure has been unable to meet these service levels. *Id.* ¶ 34.  As a result, Virtus is now subject to contract penalties that are accruing on a daily basis. Currently, the estimated failure to supply penalty at Virtus's largest levorphanol customer is $1.3 million per month.  *Id.*  Moreover, since DEA's seizure, Virtus has issued Force Majeure notifications to approximately 100 customers in an attempt to limit failure to supply penalties.  *Id.* ¶ 35.  Several large customers have responded that they do not accept the Force Majeure event,

leaving Virtus liable for financial penalties until the supply issue has been resolved.  *Id.*  Only DEA—and this Court—can resolve the ongoing supply issue.  Furthermore, these contractual issues involve significantly more than just monetary losses.  A pharmaceutical supplier that cannot meet its customers' demands will, in short order, drive their customers away.  Therefore, once Virtus's customers are able to meet their supply needs for levorphanol and phendimetrazine from other suppliers, it will likely be impossible for Virtus to earn the return of their trust and business.

And, it is not just broken customer relationships at issue.  Patients that cannot access levorphanol or phendimetrazine will have lack of access to these needed medications.  *Id.* ¶¶ 18, 28.  Lastly, as a small, privately held pharmaceutical company with a limited portfolio, Virtus relies on strategies such as a continuous supply chain to maintain and win business relationships and supply drugs to patients.  *Id.* ¶ 36.  DEA's conduct here is likely irretrievably damaging those relationships.

There are also imminent and irreparable injuries to Virtus's entire operations that will occur in the immediate future if DEA does not release its levorphanol and phendimetrazine products to another DEA-registered entity.  *Id.* ¶¶ 39, 42.  Without immediate injunctive relief, Virtus is already planning a reduction in force of its full-time employees due to its imminent cash shortfall and its breach of financial covenants with lenders due to the lack of sales cash flow from levorphanol and phendimetrazine.  It is also facing an imminent bankruptcy filing and potential liquidation of the company.  *Id.* ¶ 42.  Thus, while "in general, economic loss does not, in and of itself, constitute irreparable harm," "[e]conomic losses may be sufficient where the loss threatens the very existence of the movant's business."  *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (internal citations and quotation marks omitted).

Unless DEA is enjoined, Virtus expects to lose millions of dollars each month until it is

forced into bankruptcy as it has no other alternative.  Smith Decl. ¶¶ 34, 38, 42.  These are losses that can never be recovered from DEA by a claim for monetary damages because DEA—whose actions are arbitrary and unlawful—has sovereign immunity that would preclude Virtus from recovering damages.  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) ("Where a plaintiff cannot recover damages from an agency because the agency has sovereign immunity, 'any loss of income suffered by [the] plaintiff is irreparable *per se*.'") (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (alteration in original)), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891, 899 (D.C. Cir. 2010) ("The district court's finding that this loss would be irreparable absent an injunction appears entirely reasonable.").

## D.    The Balance of Hardships Favors Immediate Injunctive Relief.

The balance of hardships overwhelmingly favors granting Virtus's request for emergency relief.  In contrast to Virtus, which will suffer the above-described irreparable injury absent emergency relief, DEA is a governmental agency that will not suffer any cognizable injury from an injunction.  Nothing about this Court's injunction would prevent DEA from pursuing this matter or taking other lawful actions against the original, and only target, of the ISOs—Woodfield's Houston facility.  And, the remedy here—transporting the substances that are not owned by Woodfield but by Virtus—to another DEA-registered and regulated facility would ensure that the substances are maintained and handled under appropriate security and in accordance with DEA regulations.

## E.    The Public Interest Favors Immediate Injunctive Relief.

The public interest weighs heavily in favor of granting a TRO.  Again, DEA's investigation into Woodfield's Houston facility is unrelated to Virtus, its conduct, or the levorphanol and phendimetrazine over which the government has arbitrarily retained possession.  Schumacher

Decl. ¶ 3; Smith Decl. ¶ 30.   It is, therefore, wholly unnecessary for DEA to retain Virtus's levorphanol and phendimetrazine products to prevent any imminent harm to the public.  As noted above, however, Virtus's levorphanol is used in some of the sickest and most compromised patients.  Virtus's phendimetrazine is also an often prescribed and necessary medication that is rendered unavailable by DEA's actions.  Phendimetrazine is used in exercise-resistant obesity. Obesity impacts approximately 42% of the U.S. population and is the direct cause of other conditions, including heart disease, stroke, type 2 diabetes, and certain types of cancer.  *Id*. ¶ 24. And, obesity is a leading cause of preventable, premature death.  *Id.*  Moreover, Virtus remains the only supplier of phendimetrazine extended release 105 mg.  *Id.* ¶ 25.  Patients who rely on this drug have no other alternative method to obtain it.  *Id.*  Lastly, continued unlawful retention of Virtus's drugs is causing, and will continue to cause, injury to Virtus's customers and the patients that depend on Virtus for an uninterrupted supply of these drugs for their legitimate medical needs. This is not in the public interest.

## CONCLUSION

For the foregoing reasons, Virtus respectfully requests that this Court grant its motion for a temporary restraining order.

Dated: August 31, 2021        Respectfully submitted,

By:   */s/ Karla Palmer*
Karla L. Palmer (D.C. Bar No. 444353)
John A. Gilbert (D.C. Bar No. 448379)
Michael S. Heesters
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth Street NW, Suite 1200
Washington, D.C. 20005
(202) 737-5600 (phone)
(202) 737-9329 (fax)
kpalmer@hpm.com
jgilbert@hpm.com
mheesters@hpm.com

*Counsel for Virtus Pharmaceuticals, LLC*

27

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 31st day of August 2021, she caused a copy of **VIRTUS PHARMACEUTICALS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER** to be served upon the following attorneys by hand delivery and electronic mail, as indicated:

Bradley Humphreys
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 305-0878
Email: Bradley.Humphreys@usdoj.gov

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(Hand Delivery)

Anne Milgram
Administrator
U.S. Drug Enforcement Administration
8701 Morrissette Drive
Springfield, VA 22152
(Hand Delivery)

U.S. Drug Enforcement Administration
8701 Morrissette Drive

Springfield, VA 22152

(Hand Delivery)

Civil Process Clerk

U.S. Attorney's Office - District of Columbia

555 4th Street NW

Washington, DC 20530

(Hand Delivery)

*/s/ Karla Palmer*

Karla L. Palmer
*Counsel for Virtus Pharmaceuticals, LLC*