## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Virtus Pharmaceuticals, LLC<br><br>*Plaintiff*,<br><br>v.<br><br>Merrick Garland, *et al.*,<br><br>*Defendants*. | Case No. 1:21-cv-02308 |

## <u>DECLARATION OF BRIAN S. BESSER</u>

I, Brian S. Besser, under the penalty of perjury, declare and state as follows:

1. I am currently employed as the Acting Assistant Administrator for the Drug Enforcement Administration's (DEA) Diversion Control Division. As Acting Assistant Administrator, I am responsible for overseeing the DEA program responsible for preventing, detecting, and investigating the diversion of pharmaceutical controlled substances and listed chemicals from legitimate channels while ensuring an adequate and uninterrupted supply of pharmaceutical controlled substances and listed chemicals to meet legitimate medical, commercial and scientific needs. I have been employed in that capacity since August 1, 2021. Prior to that, I served as the Deputy Assistant Administrator for Operations, Diversion Control Division. I have been employed as a Special Agent with DEA for approximately 24 years.

2. I am submitting this Declaration in support of the Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order in the above-captioned matter. Based on my personal understanding and the information provided to me in my official capacity, I am familiar with the decision-making process employed by DEA in

making its determination to seal the controlled substances possessed by DEA registrants Woodfield Distribution, LLC (Woodfield Distribution), and Woodfield Pharmaceutical, LLC (Woodfield Pharma) (collectively, Woodfield), pursuant to the Order to Show Cause and Immediate Suspension of Registration (OTSC/ISO) issued to Woodfield, dated August 4, 2021, and served on August 11, 2021 (attached hereto as **Exhibit A**), which is the subject of this civil action.

3. The statements contained in this Declaration concerning the Administrator's decision are known to me as a result of my own involvement in the decision-making process, or have been provided to me by other DEA enforcement personnel.

## Woodfield Distribution, LLC and Woodfield Pharmaceutical, LLC

4. Woodfield Distribution is currently registered with DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RW0502218 at 1113 Gillingham Lane, Suite A, Sugar Land, Texas 77478. This Certificate of Registration expires by its own terms on May 31, 2022.

5. Woodfield Distribution is also registered with DEA as an importer in Schedules III through V under DEA Certificate of Registration No. RW0502814 at 1113 Gillingham Lane, Suite A, Sugar Land, Texas 77478. This Certificate of Registration expires by its own terms on May 31, 2022.

6. Woodfield Distribution is licensed by the Texas Department of State Health Services as a prescription drug distributor under license number 1001707. This state license expires by its own terms on March 30, 2023.

2

7. Woodfield Distribution is also registered with DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RW0407076 at 951 Clint Moore Road, Ste. A, Boca Raton, Florida 33487. Woodfield Distribution is also registered at the same location as an importer in Schedules III through V under DEA Certificate of Registration No. RW0518932 and as a reverse distributor in Schedules II through V under DEA Certificate of Registration No. RW0433653. These Certificates of Registration expire by their own terms on May 31, 2022.

8. Woodfield Pharma is currently registered with DEA as a manufacturer in Schedules I through V, and a manufacturer of List I chemicals, under DEA Certificate of Registration No. RW0483317 at 10863 Rockley Road, Houston, Texas 77099. This Certificate of Registration expires by its own terms on May 31, 2022.

9. Woodfield Pharma is licensed by the Texas Department of State Health Services as a prescription drug manufacturer under license number 1001461. This state license expires by its own terms on July 17, 2022.

## The Rampant Problem of Controlled Substance Diversion

10. Prescription drug abuse occurs in the United States at an alarming rate. Increases in prescription drug misuse over the last 15 years have resulted in increased emergency room visits, increased treatment admissions for prescription drug use disorders, and increased overdose deaths associated with prescription drugs.[1]

---

[1] *See* https://www.drugabuse.gov/publications/research-reports/misuse-prescription-drugs/summary

11. The most frequently abused and diverted drugs are opioid pain relievers, such as levorphanol. In October 2017, the acting Secretary of the Department of Health and Human Services declared that the "opioid crisis" was a "public health emergency."[2]

12. Unintentional overdose deaths involving opioid pain relievers have more than quadrupled since 1999.[3] In 2019, there were over 14,000 deaths involving prescription opioids.[4]

13. Stimulants, such as phendimetrazine, also are commonly abused prescription drugs.[5] Abuse of prescription stimulants can lead to a raft of negative medical consequences, including addiction, psychosis, dangerously high body temperature, and cardiovascular failure or seizures.[6]

14. Registrants who maintain large quantities of controlled substances pose a particular risk of large scale diversion. As a result, these registrants must adhere to certain physical security measures, recordkeeping and reporting requirements, and customer due diligence obligations. When these registrants fail to comply with their obligations, they become a significant source of diversion.

15. Non-compliant registrants (including Woodfield Distribution), have caused, and continue to cause, millions of dosage units of opioids – such as levorphanol – and other controlled

---

[2] *See* https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html

[3] *See* https://www.drugabuse.gov/publications/research-reports/misuse-prescription-drugs/summary

[4] *See id.*

[5] *See* https://www.drugabuse.gov/publications/research-reports/misuse-prescription-drugs/what-classes-prescription-drugs-are-commonly-misused

[6] *See id.*

substances – such as phendimetrazine – to be diverted, and they pose an imminent threat to the public health and safety.

## Regulatory Scheme

16. The Food and Drug Administration generally regulates pharmaceutical drugs. Congress, however, recognized the need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety. As such, it established a separate framework under the Controlled Substances Act (CSA), 21 U.S.C. §§ 801 *et seq.,* and implementing regulations, that creates a closed system of distribution for all controlled substances and listed chemicals. *See* H.R. Rep. No. 911444, 1970 U.S.C.C.A.N. at 4566.

17. Congress therefore established a comprehensive regulatory scheme in which controlled substances are placed in one of five "Schedules" depending on their potential for abuse, the extent to which they may lead to psychological or physical dependence, and whether they have a currently accepted medical use in treatment in the United States. *See* 21 U.S.C. § 812(b).

18. Controlled substances in "Schedule I" have a "high potential for abuse," "no currently accepted medical use in treatment in the United States," and a "lack of accepted safety for use under medical supervision." 21 U.S.C. § 812(b)(1)(A)-(C).

19. Controlled substances in Schedule II do have "a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions," but still have "a high potential for abuse." "Abuse of the drug or other substances may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2)(A)-(C).

20. Levorphanol is a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12(c)(13).

21. Controlled substances in Schedule III also have "a currently accepted medical use in treatment in the United States," and "a potential for abuse" but "less than the drugs or other substances in schedules I and II." "Abuse of the drug or other substance[s]" in Schedule III "may lead to moderate or low physical dependence or high psychological dependence." 21 U.S.C. § 812(b)(3)(A)-(C).

22. Phendimetrazine is a Schedule III controlled substance. *See* 21 C.F.R. § 1308.13(b)(5).

23. The CSA gives DEA broad authority to prevent the diversion of pharmaceutical drugs for illicit use. *See* 21 U.S.C. §§ 824(d), 871(a); 21 C.F.R. §§ 1316.65(c), 1316.67; 28 C.F.R. § 0.104, Appendix to Subpart R, Sec. 7(a).[7]

24. Pursuant to that authority, the DEA Diversion Control Division regulates every link in the prescription-drug supply chain and is responsible for regulating all DEA registrants. Every person who manufactures, distributes, dispenses, imports, or exports any controlled substance, or who proposes to engage in the manufacture, distribution, dispensing, importation, or exportation of any controlled substance must obtain a registration with the DEA. *See* 21 C.F.R. § 1301.11. It is the responsibility of the Diversion Control Division to ensure that registrants adhere to all aspects of the CSA and its implementing regulations and to take action against them when they are out of compliance.

25. The CSA is specifically designed to impose on registrants a number of due diligence, reporting, recordkeeping, and physical security requirements to enable DEA to monitor and regulate the closed system of controlled substances and to prevent diversion of controlled

---

[7] The authority given to the Attorney General under the CSA has been delegated to the DEA Administrator. *See* 28 C.F.R. § 0.100. Certain authority has been further re-delegated. *See* 28 C.F.R. § 0.104, Appendix to Subpart R, Sec. 7(a).

substances. Each DEA registrant bears a responsibility to assure the integrity of the closed system established by Congress in the CSA.

26. Specifically, with respect to distributors, registrants are required to, *inter alia*, "maintain . . . effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels . . . ." 21 U.S.C. § 823(b)(1) (detailing the obligation of distributors of controlled substances in Schedules I or II). *See also* 21 U.S.C. § 823(e)(1) (detailing the obligation of distributors of controlled substances in Schedules III, IV, or V, to include "maintenance of effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels").

27. As part of its obligation to "maintain . . . effective controls against diversion," a distributor registrant must, *inter alia*, maintain adequate physical security measures, accurately record inventory, timely and accurately report all thefts and significant losses, and design and operate a system to disclose suspicious orders of controlled substances. *See* 21 C.F.R. §§ 1301.72-73, 1301.74(b) & (c).

28. These regulations require a distributor to both adequately secure and document the controlled substances in its possession as well as to appropriately monitor where those controlled substances are distributed. Strict adherence to these requirements is critical in combatting diversion of controlled substances.

   a. With respect to physical security, DEA has concluded that "whether an applicant will provide proper physical security . . . is . . . critical in evaluating the

effectiveness of an applicant's controls against diversion." *Sujak Distributors*, 71

Fed. Reg. 50,102, 50,104 (2006).

b.  DEA has found that "[r]ecordkeeping is one of the CSA's principal tools for

preventing the diversion of controlled substances." *Wayne Pharmacy*, 85 Fed.

Reg. 63,579, 63,582 (2020). Such recordkeeping is one of the central features of

the CSA's regulatory regime because "a registrant's accurate and diligent

adherence to this obligation is absolutely essential to protect against the diversion

of controlled substances." *Superior Pharmacy I & Superior Pharmacy II*, 81 Fed.

Reg. 31,310, 31,337 (2016). Where a registrant "is abjectly unable to account for

'extraordinary quantities' of controlled substances, the Agency has held that 'it

has committed acts which render its registration inconsistent with the public

interest.'" *Top RX Pharmacy*, 78 Fed. Reg. 26,069, 26,084 (2013) (quoting *Ideal*

*Pharmacy Care, Inc. d/b/a Esplande Pharmacy*, 76 Fed. Reg. 51,415, 51,416

(2011)).

c.  DEA has determined that reporting thefts and significant losses is a critical part of

effective controls and procedures to guard against theft and diversion. *See Wayne*

*Pharmacy*, 85 Fed. Reg. at 63,582 (holding that a registrant's failure to promptly

notify DEA of the significant loss of controlled substances violated DEA

regulations requiring registrants to provide effective controls and procedures to

guard against theft and diversion of controlled substances).

d.  DEA has also emphasized to distributors the importance of suspicious order

monitoring systems. In a letter dated September 27, 2006, a letter DEA publicly

circulated to distributors (**attached hereto as Exhibit B**), DEA described

distributors' responsibility to "be vigilant in deciding whether a prospective

customer can be trusted to deliver controlled substances only for lawful purposes"

as "critical" to maintaining the "closed system of [controlled] drug distribution."

Ex. B, 1.

29. Because distributors handle such large volumes of controlled substances, they are the first

major line of defense against the movement of legal pharmaceutical controlled substances

and List I Chemicals from legitimate channels into the illicit market. It is incumbent on

distributors to maintain effective controls to prevent diversion of controlled substances.

Should a distributor deviate from these checks and balances, the closed system created by the

CSA would collapse.

**Administrative Enforcement Actions**

30. When a distributor is not adhering to its legal obligations, the DEA has authority to revoke or

suspend that distributor's registration. *See* 21 U.S.C. § 824(a)(4) (authorizing the suspension

or revocation of a registration where the registrant "has committed such acts as would render

his registration . . . inconsistent with the public interest").

31. The CSA sets forth five factors to be used to determine whether a distributor's registration

would be consistent with the public interest as determined by the following five factors: (1)

maintenance of effective control against diversion of particular controlled substances into

other than legitimate medical, scientific, and industrial channels; (2) compliance with

applicable State and local law; (3) prior conviction record of applicant under Federal or State

laws relating to the manufacture, distribution, or dispensing of such substances; (4) past

experience in the distribution of controlled substances; and (5) such other factors as may be consistent with the public health and safety. 21 U.S.C. § 823(b) & (e).

32. Ordinarily, DEA must hold a hearing prior to revocation or suspension of an entity's registration. But when the DEA has reason to believe that a registrant's continued operation during the pendency of administrative proceeding would pose "an imminent danger to the public health or safety," the DEA has discretion to suspend that party's registration immediately, prior to the administrative hearing. 21 U.S.C. § 824(d).

33. The DEA may find that a registrant's continued operation would pose an "imminent danger" where the DEA finds that "due to the failure of the registrant to maintain effective controls against diversion or otherwise comply with the obligations of a registrant . . . , there is a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." *Id.*

34. Where DEA immediately suspends a registrant's registration, it must serve the registrant with an Order to Show Cause which "shall contain a statement of [the DEA's] findings regarding the danger to public health and safety." 21 C.F.R. § 1309.44(a). A Section 824(d) suspension remains in effect until DEA issues a final order, unless the suspension is withdrawn by the Attorney General or dissolved by a court of competent jurisdiction. 21 U.S.C. § 824(d).

35. Once a registration is revoked or suspended (including pursuant to an immediate suspension), "all controlled substances or list I chemicals owned or possessed by the registrant pursuant to such registration . . . may, in the discretion of the [DEA Administrator], be placed under seal." 21 U.S.C. § 824(f). To effectuate this, DEA may either direct the registrant to place the

controlled substances under seal (at the registered location), or direct the registrant to deliver the controlled substances to DEA (to be removed for safekeeping). 21 C.F.R. § 1301.36(f).

36. In nearly every case in which DEA immediately suspends a registrant's registration, it places that registrant's controlled substances under seal, and directs the registrant to deliver the controlled substances at issue to DEA. Those controlled substances are then removed for safekeeping. A number of prudential considerations drive this practice, including, but not limited to, the following:

    a.  DEA's authority for immediately suspending any registrant's registration is based on DEA's determination that the registrant's continued registration would pose an imminent danger to the public health or safety. Accordingly, leaving those controlled substances unsealed will almost always itself pose a danger to the public health or safety.

    b.  Where the registrant's ability to handle controlled substances has been suspended, that registrant is no longer authorized to possess or handle controlled substances. Leaving the controlled substances in the possession of a suspended registrant is contrary to the closed system of distribution (and would potentially expose the suspended registrant to additional liability).

    c.  Sealing the controlled substances while leaving them at the registered location imposes administrative difficulties on DEA (*e.g.*, ensuring that those controlled substances remain sealed), as well as on the registrant, who will be required to maintain those controlled substances without the ability to dispose of them until

the administrative proceedings terminate and without the ability to lawfully

handle them while the proceedings are ongoing.

    d.  Moreover, leaving the controlled substances in the hands of such a registrant

(sealed or otherwise), rather than having that registrant deliver them to DEA, will

typically itself pose a danger to the public health or safety.

37. Once those controlled substances have been placed under seal, "[n]o disposition may be

made of any controlled substances or list I chemicals under seal until the time for taking an

appeal has elapsed or until all appeals have been concluded." 21 U.S.C. 824(f). The only

exception to that rule is that "a court, upon application therefor, may at any time order the

sale of perishable controlled substances or list I chemicals." *Id.*

### DEA's Sealing of Controlled Substances Possessed by Woodfield

38. For reasons set forth in part in the OTSC/ISO issued to Woodfield, DEA immediately

suspended certain of Woodfield's Certificates of Registration, Nos. RW0502218,

RW0502814, and RW0483317. In addition to suspending those Certificates of Registration,

the Administrator exercised her discretion and authorized the DEA personnel who served the

OTSC/ISO to "place under seal or remove for safekeeping all controlled substances that

Woodfield possesses pursuant to the [suspended] registrations."

39. Upon serving the OTSC/ISO on Woodfield, DEA sealed all of the controlled substances in

Woodfield's possession pursuant to the above-noted Certificates of Registration by directing

Woodfield to deliver those controlled substances to DEA and removing those controlled

substances for safekeeping.

12

40. In this case, declining to place the controlled substances possessed by Woodfield under seal or directing Woodfield to seal the controlled substances in place at its facilities would have been particularly inappropriate. As set forth in the attached OTSC/ISO, DEA found, among other things, that Woodfield persistently failed to enact adequate physical security measures to ensure that controlled substances in Woodfield's possession were not being diverted into illegitimate channels. Leaving the controlled substances with Woodfield would ignore these concerns.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.


_____
Brian S. Besser

# EXHIBIT A



**U.S. Department of Justice**
Drug Enforcement Administration

---

*Office of the Administrator*                    *Springfield, VA 22152*

08/04/2021

**IN THE MATTER OF**

Woodfield Distribution, LLC
1113 Gillingham Lane, Suite A
Sugar Land, Texas 77478

Woodfield Pharmaceutical, LLC
10863 Rockley Road
Houston, Texas 77099

DEA Certificates of Registration:
RW0502218, RW0502814, and RW0483317

## ORDER TO SHOW CAUSE AND
## IMMEDIATE SUSPENSION OF REGISTRATION

**PURSUANT** to Sections 303 and 304 of the Controlled Substances Act, Title 21,
United States Code, Sections 823 and 824,

**NOTICE** is hereby given to inform Woodfield Distribution, LLC (Woodfield Distribution)
and Woodfield Pharmaceutical, LLC (Woodfield Pharma) (collectively, Woodfield) of the
immediate suspension of Drug Enforcement Administration (DEA) Certificates of Registration
(COR) Nos. RW0502218, RW0502814, and RW0483317, pursuant to 21 U.S.C § 824(d),
because Woodfield's continued registration constitutes "an imminent danger to the public health
or safety." Notice is also given to afford Woodfield an opportunity to show cause before DEA at
the DEA Hearing Facility located at 1550 Crystal Drive, Suite 901, Arlington, Virginia 22202,
on October 5, 2021, or on such a subsequent date designated by the Administrative Law Judge
(if Woodfield requests such a hearing), as to why DEA should not revoke Woodfield's
registrations pursuant to 21 U.S.C. § 824(a)(4), deny any pending applications for renewal or
modification of such registrations, and deny any applications for additional DEA registrations,
because Woodfield's continued registration is inconsistent with the public interest, as that term is
defined in 21 U.S.C. § 823(a), (b), (d), & (e).

1

As detailed below, this order states DEA's basis for this Order to Show Cause and Immediate Suspension of Registration, including a ***non-exhaustive summary*** of facts and law at issue, as well as citations to laws and regulations that Woodfield has violated (*see* 21 C.F.R. §§ 1301.36(e) and 1301.37(c), which DEA construes *in pari materia*). In order to preserve Woodfield's rights in this proceeding, Woodfield may appear in these revocation proceedings by filing a notice of appearance or request for hearing in the manner prescribed by regulations within 30 days from the receipt of this Order.

1.  Woodfield Distribution and Woodfield Pharma are related entities and share common ownership. Woodfield Distribution holds itself out as providing "integrated third-party logistics pharmaceutical services and value-added solutions." Woodfield Distribution operates as an importer and distributor of controlled substances. It imports controlled substances from foreign manufacturers or obtains them from domestic manufacturers and then distributes them to customers across the United States. Woodfield Pharma is a "pharmaceutical contract manufacturer" specializing in oral solutions, liquid solutions, suspensions, and semi-solids, including controlled substances.

## WOODFIELD DISTRIBUTION, LLC

2.  Woodfield Distribution is currently registered with DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RW0502218 at 1113 Gillingham Lane, Suite A, Sugar Land, Texas 77478. This Certificate of Registration expires by its own terms on May 31, 2022.

3.  Woodfield Distribution is also registered with DEA as an importer in Schedules III through V under DEA Certificate of Registration No. RW0502814 at 1113 Gillingham Lane, Suite A, Sugar Land, Texas 77478. This Certificate of Registration expires by its own terms on May 31, 2022.

4.  Woodfield Distribution is licensed by the Texas Department of State Health Services as a prescription drug distributor under license number 1001707. Woodfield Distribution's state license expires by its own terms on March 30, 2023.

**FAILURE TO MAINTAIN EFFECTIVE CONTROLS AGAINST DIVERSION**

5.  Controlled substance distributors have an affirmative obligation to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). Failure to maintain such effective controls can render a distributor's continued registration "inconsistent with the public interest" as defined in the Controlled Substances Act (CSA). *See* 21 U.S.C. § 823(b)(1) (in order for its registration to be in the public interest, a drug distributor is required to, *inter alia*, "maintain[] effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels");[1]

---

[1] Woodfield is registered with the DEA as a distributor in Schedules II through V. The "public interest" considerations for distributors in Schedules I and II are set forth at 21 U.S.C. § 823(b). The "public interest"

2

see also *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418, 55,473 (2015), *pet. for rev. denied Masters Pharmaceuticals, Inc. v. DEA*, 861 F.3d 206 (D.C. Cir. 2017); *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487, 36,498 (2007).

6.  The regulations set forth "security requirements" to be used "[i]n order to determine whether a registrant has provided effective controls against diversion." 21 C.F.R. § 1301.71(a). These security requirements include, but are not limited to:

    a.  physical security requirements, *id.* § 1301.72-73;

    b.  requirement to detect and report "suspicious orders of controlled substances," *id.* § 1301.74(b); and

    c.  requirement to report "any theft or significant loss of any controlled substances," *id.* § 1301.74(c).

7.  As discussed below, DEA's investigation, including three on-site visits in 2020, revealed that Woodfield Distribution manifestly failed to comply with its obligation to maintain effective controls against the diversion of controlled substances. Woodfield Distribution's violations include the persistent and comprehensive failure to maintain complete and accurate records, report thefts or significant losses when appropriate, detect and report suspicious orders, and comply with the physical security requirements imposed on registrants. As detailed below, many of these violations continued through as recently as at least May 2021.

**<u>Violations Regarding Missing Controlled Substances</u>**

<u>Failure to Maintain Accurate Continuing Records</u>

8.  "Recordkeeping is one of the CSA's principal tools for preventing the diversion of controlled substances." *Wayne Pharmacy*, 85 Fed. Reg. 63,579, 63,582 (2020). Recordkeeping is one of the central features of the CSA's regulatory regime because "a registrant's accurate and diligent adherence to this obligation is absolutely essential to protect against the diversion of controlled substances." *Superior Pharmacy I & Superior Pharmacy II*, 81 Fed. Reg. 31,310, 31,337 (2016).

9.  Where a registrant "is abjectly unable to account for 'extraordinary quantities' of controlled substances, the Agency has held that 'it has committed acts which render its registration inconsistent with the public interest.'" *Top RX Pharmacy*, 78 Fed. Reg. 26,069, 26,084 (2013) (*quoting Ideal Pharmacy Care, Inc. d/b/a Esplande Pharmacy*, 76 Fed. Reg. 51,415, 51,416 (2011)).

---

considerations for distributors in Schedules III through V are set forth at 21 U.S.C. § 823(e). Insofar as these statutory provisions are materially identical, this Order cites Section 823(b) for the public interest considerations for controlled substance distributors. However, these requirements apply equally to Woodfield's authorization to distribute controlled substances in Schedules III through V.

10. As a distributor, Woodfield Distribution must, *inter alia*, "maintain, on a current basis, a complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of by him/her, and each inner liner, sealed inner liner, and unused and returned mail-back package[.]" 21 C.F.R. § 1304.21(a); *see also* 21 C.F.R. § 1304.22(b) (specific recordkeeping requirements for distributors).

11. In March 2020, DEA investigators conducted an audit of Woodfield Distribution's controlled substances records by taking an inventory of the controlled substances present at Woodfield Distribution's registered location and comparing that inventory to the records maintained and provided by Woodfield Distribution. DEA's audit found that Woodfield Distribution did not account for significant quantities of controlled substances. This violated 21 C.F.R. §§ 1304.21(a) and 1304.22(b). *See Bill Lloyd Drug*, 64 Fed. Reg. 1,823, 1,824 (1999) ("The shortages and overages revealed by the accountability audit show that Respondent does not keep complete and accurate records of its controlled substance handling as required by 21 U.S.C. 827 and 21 CFR 1304.21."). Specifically, Woodfield Distribution was unable to account for:

   a. 67,197,000 dosage units of tramadol 50 mg, a Schedule IV controlled substance;

   b. 5,108,000 dosage units of phendimetrazine 35mg, a Schedule III controlled substance;

   c. 378,000 dosage units of phendimetrazine 105mg;

   d. 285,600 dosage units of levorphanol tartrate 2mg, a Schedule II controlled substance;

   e. 144,000 dosage units of phenobarbital 97.2mg, a Schedule IV controlled substance; and

   f. 88,496 bottles of guaifenesin with codeine 473ml, a Schedule V controlled substance.

12. Woodfield Distribution's failure to account for tens of millions of dosage units of controlled substances not only violated its obligation to maintain accurate records, but also constituted a significant failure to comply with Woodfield Distribution's obligation to maintain effective controls against the diversion of controlled substances into illicit channels. *See, e.g.*, *Superior Pharmacy*, 81 Fed. Reg. at 31,337.

Failure to Report Theft or Significant Loss of Controlled Substances

13. Registrants "must notify the [DEA] . . . , in writing, of any theft or significant loss of any controlled substances within one business day of discovery of the theft or loss. . . . The registrant must also complete, and submit to the Field Division Office in his or her area, DEA Form 106 regarding the theft or loss." 21 C.F.R. § 1301.74(c).

4

14. "Thefts and significant losses must be reported whether or not the controlled substances are subsequently recovered or the responsible parties are identified and action taken against them." *Id.*

15. On or about January 13, 2019, a burglary occurred at Woodfield Distribution's registered location. At least 217,200 dosage units of alprazolam, a Schedule IV controlled substance, were stolen. Woodfield Distribution never filed a theft or loss report with DEA, in violation of 21 C.F.R. § 1307.74(c), despite being informed subsequently by DEA of Woodfield Distribution's responsibility to do so.

16. DEA has identified at least 45 shipments that Woodfield Distribution distributed between January 1, 2019, and March 9, 2020, in which shipments of controlled substances, *viz.*, tramadol, and guaifenesin with codeine, were unaccounted for or missing.[2] This constituted a significant loss of controlled substances, as defined under 21 C.F.R § 1301.74(c). However, for that time period, Woodfield Distribution filed only one theft or loss report. Woodfield Distribution therefore failed to report at least 44 shipments with missing controlled substances totaling hundreds of thousands of dosage units.

17. During an inspection of Woodfield Distribution's facilities on March 9, 2020, DEA investigators discussed with Woodfield Distribution its obligation to file theft or loss reports under the regulations. Subsequently, between March 10, 2020, and March 18, 2021, Woodfield Distribution filed 26 theft or loss reports. However, for that same period, DEA identified at least 58 shipments where controlled substances, *viz.*, tramadol, levorphanol, and guaifenesin with codeine, distributed by Woodfield Distribution were unaccounted for or missing. Woodfield Distribution therefore failed to report at least 32 shipments missing tens of thousands of dosage units of controlled substances in total.

18. By failing to report the theft and/or loss of hundreds of thousands of dosage units of controlled substances in an approximately two-year period, Woodfield Distribution violated its reporting obligations under 21 C.F.R. § 1307.74(c). It also failed to comply with its obligation to maintain effective controls against the diversion of controlled substances into illicit channels. *Cf. Wayne Pharmacy*, 85 Fed. Reg. at 63,582 ("Registrant's failure to notify DEA of the significant loss of controlled substances within one business day of discovering the loss was a violation of 21 CFR 1301.76(b) and a violation of 21 CFR 1301.71, which requires all registrants to provide 'effective controls and procedures to guard against theft and diversion of controlled substances' as set forth in 1301.72-76.").

---

[2] In a distribution transaction, the distributor "is responsible for reporting all in-transit losses of controlled substances by their agent or the common or contract carrier selected [by them], within one business day of discovery of such theft or loss." 21 C.F.R. § 1301.74(c).

**Failure to Operate an Effective System to Identify and Report "Suspicious Orders"**

19. Registrants "shall design and operate a system to identify suspicious orders for the registrant" and "upon discovering a suspicious order or series of orders, notify" the DEA. 21 U.S.C. § 832(a); *see also* 21 C.F.R. § 1301.74(b) (registrants "shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.").

20. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b); *see also* 21 U.S.C. § 802(57) (the term "suspicious order" may include, but is not limited to "(A) an order of a controlled substance of unusual size; (B) an order of a controlled substance deviating substantially from a normal pattern; and (C) orders of controlled substances of unusual frequency").

21. The enumerated criteria are disjunctive and not exhaustive and "other indicia may also raise suspicions about an order for controlled substances." *Masters Pharmaceuticals, Inc. v. DEA*, 861 F.3d 206, 221 (D.C. Cir. 2017) (citing *Southwood Pharmaceuticals*, 72 Fed. Reg. 36,487, 36,501-02 (2007)). For example, the customer's "business model, dispensing patterns, or other characteristics might make an order suspicious, despite the particular order not being of unusual size, pattern or frequency." *Masters Pharmaceuticals*, 80 Fed. Reg. 55,418, 55,474 (2015).

22. The regulation imposes an affirmative obligation on a registrant to monitor for, and detect, any information that "raises a substantial question as to the legitimacy of a customer's [business] practices." *Masters Pharmaceuticals*, 80 Fed. Reg. at 55,478. The regulation is "violated where the registrant has obtained information that an order is suspicious but then chooses to ignore that information and fails to report the order." *Id.*

23. In addition, DEA has recognized that a registrant must properly document its suspicious order monitoring procedures, any indicia of suspiciousness that it is aware of, and any steps taken to address or resolve indicia of suspiciousness. "Even if the Agency's regulations do not require a distributor to document the reason provided by a customer to justify a suspicious order [under 21 C.F.R. § 1301.74(b)], documenting that reason is still an essential part of maintaining effective controls against diversion because subsequent events may provide information which show that the reason was false." *Masters Pharmaceuticals*, 80 Fed. Reg. at 55,428 n. 21.

24. Similarly, "where there is an absence of documentation that Respondent performed the respective act, that absence is substantial evidence that Respondent did not perform the act." *Id.* at 55,428. Failing to document due diligence investigations is thus a violation of the general obligation to maintain effective controls against diversion.

25. Between at least April 7, 2018, and the present, Woodfield Distribution has not reported any suspicious orders to DEA.

26. On April 7, 2020, Woodfield Distribution provided DEA with a copy of its Suspicious Order Monitoring System Standard Operating Procedure (SOP) effective February 17, 2020. In the SOP, Woodfield Distribution recognized its obligation to "maintain an effective due diligence program to guard against the diversion" of controlled substances, "to detect suspicious orders," and to "ensure compliance with both regulatory and contractual requirements."

27. The SOP provided, in relevant part, that orders for controlled substances "must be authenticated through W[oodfield ]D[istribution]'s SOMS in Datex and flagged if the order does not comply."[3] Specifically, the SOP required Woodfield Distribution to monitor for orders that were: (1) "[i]dentical to another order placed within a seven (7) day time period;" (2) "[i]n excess of two (2) times the monthly average per Class or Customer average;" or (3) that represent a "drastic shift in order patterns and/or ordering time periods." According to the SOP, orders that meet these criteria will "trigger an investigation" and a report to DEA "within one (1) business day of discovery."[4]

28. On or about May 18, 2021, DEA served an administrative subpoena on Woodfield Distribution requesting "any and all documents pertaining to the design and operation of the controlled substance suspicious orders monitoring and reporting for Woodfield Distribution."

29. The administrative subpoena included a request for records regarding "any systems designed and utilized by [Woodfield Distribution] to identify and report suspicious orders of controlled substance" and any records regarding any "due diligence or internal investigations conducted on potentially suspicious orders made for controlled substances, including—but not limited to—documentation thereof and/or communications concerning the procedures utilized during and the results of any such investigations."

30. On or about May 20, 2021, Woodfield Distribution's president and owner Adam Runsdorf responded, "[a]t this time, there are no records of Suspicious Order Reports filed by Woodfield Distribution, LLC referencing the company's Sugar Land, TX facility location for controlled substances." The response also offered to provide additional information regarding the Datex system.

---

[3] Datex Corporation is a third-party software company that provides warehouse management software to its customers, including Woodfield Distribution.

[4] Woodfield Distribution also provided DEA investigators with an earlier version of the SOP, effective August 10, 2018, which was materially similar to the February 2020 SOP. Woodfield later provided a revised SOP, dated March 25, 2020. This version was materially identical to the February 2020 SOP.

31. On May 26, 2021, Woodfield Distribution's president again confirmed to DEA that "[a]t this time, there have not been any Suspicious Orders identified nor reporting filed by Woodfield Distribution, LLC referencing the company's Sugar Land, TX facility location for controlled substances." The May 26, 2021 response also represented that the Datex system had the "ability to customize and develop certain audit trail functionality and reporting for Suspicious Order Monitoring."[5]

32. Woodfield Distribution never produced any documents or records regarding any due diligence or investigations conducted with respect to any customers or orders of controlled substances. Indeed, Woodfield Distribution has continually maintained that its system has not flagged any potentially suspicious orders for review.

33. On or about May 25, 2021, DEA served an administrative subpoena on Datex, seeking information regarding Datex products and/or licenses used by Woodfield Distribution and any Datex products related to suspicious order monitoring, including any implementation of Datex products in connection with Woodfield Distribution's suspicious order monitoring system.

34. Based on a review of the materials produced by Datex, and conversations between Datex personnel and DEA investigators, DEA determined that Datex does not provide suspicious order monitoring products. DEA also determined that Woodfield Distribution has not customized the Datex software in a manner that would allow Woodfield Distribution to undertake the type of review outlined in the various SOPs.

35. In addition, DEA conducted an analysis of certain orders for controlled substances distributed by Woodfield Distribution between January 18, 2019, and April 13, 2021. DEA reviewed information regarding approximately 13,150 orders of controlled substances distributed by Woodfield Distribution during that period.

36. DEA's analysis replicated the enumerated indicia of suspiciousness set forth in Woodfield Distribution's SOP.[6] Specifically, DEA's analysis identified: (1) orders that were identical to another order for the same product distributed to the same customer within the prior seven days, and (2) orders that exceeded two times the prior month's average of orders for that product by that customer.

---

[5] The May 26, 2021 response also included a revised SOP, dated May 25, 2021. The May 25, 2021 SOP provides simply that Woodfield will monitor for suspicious orders, to include "order of unusual size, orders deviating substantially from a normal pattern and orders of unusual frequency" and that "[o]rders shall be restricted if there is a shift in order patterns and/or ordering time periods." As an "[e]xample," the May 25, 2021 SOP indicated that Woodfield Distribution will look for orders "[i]n excess of three (3) times above historical monthly average per volume and frequency of individual controlled drug product and/or customer or client."

[6] In conducting this analysis, DEA does not concede that the system described in the SOP would have been compliant with 21 C.F.R. § 1301.74(b), if operated. Nor does DEA concede that the criteria set forth in the SOP are indicia of suspiciousness. Instead, the purpose of DEA's analysis was to determine whether Woodfield Distribution's failure to flag any orders was consistent with its own purported protocols. *Cf. Masters Pharmaceuticals*, 80 Fed. Reg. at 55,528 ("[T]he fact that such documentation is not required by DEA regulations or any established industry standard . . . is beside the point given that Respondent represented to the Agency that it would maintain such documentation.").

8

37. DEA's analysis identified 995 instances where Woodfield Distribution filled an order for a controlled substance for a customer who had placed an order for the same quantity of the same product in the previous seven days.

38. DEA's analysis identified 1,190 instances where Woodfield filled an order for a controlled substance that exceeded two times the monthly average of orders for that product distributed to that customer. On 140 of those occasions, the order for controlled substances filled by Woodfield Distribution exceeded *five times* the monthly average of orders for that product purchased by that customer.

39. The failure of Woodfield Distribution to "flag" thousands of orders of controlled substances that met its internal criteria for "suspiciousness"—much less to investigate these orders or document the resolution of such investigation—represents a failure by Woodfield Distribution to comply with its own policies and procedures for verifying the legitimacy of orders for controlled substances. Woodfield Distribution's broader failure to design and operate a system to detect and report suspicious orders, constitutes an ongoing violation of 21 C.F.R. § 1301.74(b).

## Failure to Substantially Comply with the Physical Security Requirements

40. Registrants must substantially comply with the physical security requirements set forth in 21 C.F.R. §§ 1301.71-77. "Substantial compliance with the [physical security] standards . . . may be deemed sufficient by the Administrator after evaluation of the overall security system and needs of the applicant or registrant." 21 C.F.R. § 1301.71(b).

41. In evaluating the overall security system of a registrant or applicant, the Administrator may consider any or all of fifteen specifically enumerated factors "as he may deem relevant to the need for strict compliance with security requirements[.]" *Id.*

42. DEA investigators conducted inspections of Woodfield Distribution's facilities on March 9-11, 2020; August 21, 2020; and November 10, 2020. During these inspections, DEA investigators observed numerous violations of the physical security standards set forth in the regulations. These violations included, but were not limited to, the following:

   a. Unsecured Controlled Substances: Schedule III through V controlled substances must be properly stored in a secure storage area. *See* 21 C.F.R. 1301.72(b). Woodfield Distribution routinely stored large quantities of such controlled substances in non-secure areas of its warehouse. Specifically, DEA investigators observed at least the following controlled substances stored in unsecured aisles:

      i. On March 9-11, 2020, pallets of tramadol and acetaminophen-caffeine-dihydrocodeine bitartrate combination products, Schedule III controlled substances.

9

    ii. On August 21, 2020, more than 45 pallets of controlled substances consisting of either guaifenesin with codeine, phendimetrazine, phenobarbital, or tramadol. Woodfield Distribution falsely recorded these controlled substances as being stored in its controlled substance cage. In addition, many of the unsecured boxes of controlled substances on these pallets were torn open, either awaiting destruction or being used to fill orders.

    iii. On November 10, 2020, ten pallets of controlled substances, consisting of either phenobarbital or phendimetrazine. Woodfield Distribution falsely recorded many of these controlled substances as being stored in its controlled substance cage. In addition, many of the unsecured boxes of controlled substances on these pallets were torn open, either awaiting destruction or being used to fill orders.

    iv. In March 2020 and August 2020, when DEA investigators inquired about these unsecured controlled substances, Woodfield Distribution management responded that the controlled substance cage was too full. In November 2020, Woodfield Distribution management told DEA investigators it had moved certain controlled substances to make room to fill orders. Management also indicated they had been unaware that other controlled substances were not being stored inside the cage.

b. <u>Inadequate Alarm System:</u> Woodfield Distribution's controlled substance cage must be equipped with an alarm system as sort forth in 21 C.F.R. § 1301.72(b)(4)(v). Woodfield Distribution employees routinely bypassed the alarm systems in the controlled substance cage.

    i. According to records maintained by Woodfield Distribution's security monitoring company, between March 12, 2020, and September 21, 2020, Woodfield Distribution employees bypassed alarms from four zones covering the controlled substance cage (including the cage door) at least 124 times.

    ii Woodfield Distribution employees continued to bypass these alarm zones even though DEA investigators warned against this practice during both the March 2020 and August 2020 inspections. Despite these repeated warnings, these bypasses continued until at least September 21, 2020.

c. <u>Inadequate Locking of Controlled Substance Cage:</u> Woodfield Distribution's controlled substance cage must be equipped with "a door which is kept closed and locked at all times when not in use and when in use is kept under direct observation of a responsible employee or agent of the registrant is permitted in lieu of a self-closing, self-locking door." 21 C.F.R. § 1301.72(b)(4)(iv) & (b)(3)(ii). In addition, "Locking devices for such doors shall be either of the multiple-position combination or key lock type and . . . [i]n the case of key locks, shall require key control which limits access to a limited number of employees[.]" *Id.*

      i.  During the March 9, 2020 inspection, the door was broken and could not be locked.

      ii.  During the subsequent inspections, a padlock had been placed on the door; however, the key to the padlock was kept on a table next to the door in an unsupervised, unsecured box in plain view.

  d.  <u>Other Security Issues:</u> In addition to the above violations, DEA investigators discovered the following additional issues related to Woodfield Distribution's controlled substance cage during the inspections in March, August, and November 2020:

      i.  Between October 6, 2020, and October 30, 2020, the security cameras in the warehouse, including those covering the controlled substance cage, were inoperable. During this time, Woodfield Distribution received at least 18,000 bottles of Schedule II through V controlled substances.

      ii.  On March 9, 2020, and November 10, 2020, DEA investigators observed non-controlled substances being stored in the controlled substance cage, without written approval from DEA, in violation of 21 C.F.R. § 1301.72(b)(8)(ii).

## WOODFIELD PHARMACEUTICAL, LLC

43. Woodfield Pharma is currently registered with the DEA as a manufacturer in Schedules I through V, and a manufacturer of List 1 chemicals, under DEA Certificate of Registration No. RW0483317 at 10863 Rockley Road, Houston, Texas 77099. This Certificate of Registration expires by its own terms on May 31, 2022.

44. Woodfield Pharma is licensed by the Texas Department of State Health Services as a prescription drug manufacturer under license number 1001461. Woodfield Pharma's state license expires by its own terms on July 17, 2022.

45. As discussed below, DEA's investigation revealed that significant quantities of controlled substances were removed from Woodfield Pharma without proper documentation or accounting and that Woodfield Pharma had connections to a suspected drug trafficking organization.

### FAILURE TO MAINTAIN EFFECTIVE CONTROLS AGAINST DIVERSION

### **Violations Regarding Wrongfully Removed Controlled Substances**

46. "Recordkeeping is one of the CSA's principal tools for preventing the diversion of controlled substances." *Wayne Pharmacy*, 85 Fed. Reg. at 63,582. Recordkeeping is one of the central features of the CSA's regulatory regime because "a registrant's accurate and diligent adherence to this obligation is absolutely essential to protect against the diversion of controlled substances." *Superior Pharmacy*, 81 Fed. Reg. at 31,337.

47. Where a registrant "is abjectly unable to account for extraordinary quantities of controlled substances, the Agency has held that it has committed acts which render its registration inconsistent with the public interest." *Top RX Pharmacy*, 78 Fed. Reg. at 26,084 (quoting *Ideal Pharmacy Care*, 76 Fed. Reg. at 51,416). Further, DEA has previously held that "willingness to falsify records . . . makes questionable [a registrant's] commitment to the DEA statutory and regulatory requirements designed to protect the public from the diversion of controlled substances." *Ace Wholesale & Trading Co.*, 67 Fed. Reg. 12,574, 12,576 (2002).

48. As a manufacturer, Woodfield Pharma must, *inter alia*, "maintain, on a current basis, a complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of by him/her, and each inner liner, sealed inner liner, and unused and returned mail-back package[.]" 21 C.F.R. § 1304.21(a); *see also* 21 C.F.R. § 1304.22(a) (specific recordkeeping requirements for manufacturers).

49. Additionally, "employees who possess, sell, use or divert controlled substances . . . shall . . . immediately become the subject of independent action regarding their continued employment. The employer will assess the seriousness of the employee's violation, the position of responsibility held by the employee, past record of employment, etc., in determining whether to suspend, transfer, terminate or take other action against the employee." 21 C.F.R. § 1301.92.

50. On or about October 1, 2019, two Woodfield Pharma employees entered the controlled substances vault on the premises of Woodfield Pharma after business hours. These two employees removed at least codeine, a Schedule II controlled substance, from the vault, and left the premises with controlled substances they had removed. These employees failed to document that they removed these controlled substances from the vault. Instead, they falsely documented that they had removed only a "Data Logger."

51. Notwithstanding the fact that this removal of controlled substances was recorded by Woodfield Pharma's video security system, and that Woodfield Pharma discovered the falsification of records, to DEA's knowledge, the two employees were never subjected to meaningful disciplinary action regarding this event and remain employed at Woodfield Pharma.

## CONNECTIONS TO DRUG TRAFFICKING ORGANIZATION

52. In determining whether a manufacturer's registration is consistent with the public interest, DEA is to consider "such other factors as may be relevant to and consistent with the public health and safety." 21 U.S.C. § 823(a)(6) & (d)(6).

53. On February 22, 2021, DEA received a tip from a confidential source (CS) that Woodfield Pharma planned to deliver hundreds of gallons of suspected promethazine, a non-controlled substance, to members of a suspected drug trafficking organization (DTO). The CS had observed Woodfield Pharma employees loading a truck with 55-

12

gallon drums. DEA investigators then followed the truck to a warehouse leased by a member of the suspected DTO, and observed members of the suspected DTO unloading the same 55-gallon drums identified by the CS into the warehouse.

54. On February 23, 2021, DEA executed a search warrant at the warehouse. DEA discovered suspected promethazine as well as drug trafficking paraphernalia, including, but not limited to, 36 55-gallon drums; 291 bottles containing suspected promethazine; approximately 45,000 counterfeit labels for either promethazine or promethazine with codeine, a Schedule V controlled substance; a volumetric filling machine; capping machines; and a pill press.

55. On March 1, 2021, DEA seized a Federal Express package containing $7,000 in U.S. currency, provided by a member of the suspected DTO and addressed to Adam Runsdorf—the president and sole owner of both Woodfield Distribution and Woodfield Pharma.

56. Woodfield Pharma's paid participation in illicit activity by a suspected DTO demonstrates that Woodfield Pharma's continued registration is not consistent with the public health and safety. *See Wonderyears, Inc.*, 74 Fed. Reg. 457, 458 n.2 (2009) (noting that respondent's "violations of federal and state laws in distributing and importing" a non-controlled substance "are relevant in assessing whether it would comply with the Controlled Substances Act.").

## <u>COMMON OWNERSHIP OF THE WOODFIELD ENTITIES</u>

57. "[W]here misconduct has previously been proved with respect to the owners, officers, or key employees of a [registrant]," DEA can revoke the registration of a second, related, registrant, "where the Government shows that such individuals have influence over the management or control of the second [entity]." *Superior Pharmacy*, 81 Fed. Reg. at 31,341 n.71.

58. "Further, the Agency may revoke a registration, even if there is no misconduct that can be attributed to the registration, if the Agency finds that the registrant committed egregious misconduct under a second registration." *Morning Star Pharmacy & Medical Supply 1*, 85 Fed. Reg. 51,045, 51,062 (2020).

59. Woodfield Distribution and Woodfield Pharma are commonly owned. Specifically, Adam Runsdorf is the president and sole owner of both Woodfield Distribution and Woodfield Pharma. As such, Mr. Runsdorf exercises significant influence and control over both Woodfield Distribution and Woodfield Pharma.

60. Given the fact that the same individual exercises management and control over both entities, the misconduct of either entity is relevant to the determination of whether the other can be entrusted with a DEA registration. *See Morning Star*, 85 Fed. Reg. at 51,062 ("Due to the commonality of ownership, management, and key employees between Respondent Pharmacy and Cedar Hill, any misconduct related to controlled

13

substances at Cedar Hill is relevant to the determination of whether Respondent Pharmacy can be entrusted with registration.").

## IMMINENT DANGER TO THE PUBLIC HEALTH AND SAFETY

61. Due to Woodfield's manifest failure to maintain effective controls against the diversion of controlled substances, including the persistent and comprehensive failure to maintain complete and accurate records, to report thefts or significant losses when appropriate, to detect and report suspicious orders, and to comply with the physical security requirements imposed on registrants, Woodfield's continued operation poses an "imminent danger to the public health or safety" within the meaning of 21 U.S.C. 824(d).

**IN** view of the foregoing, and pursuant to 21 U.S.C. §§ 823(b) and 824(a)(4), it is my preliminary finding that Woodfield's continued registration is inconsistent with the public interest. It is my preliminary finding that Woodfield has failed to maintain effective controls against the diversion of controlled substances, including the persistent and comprehensive failure to maintain complete and accurate records, to detect and report suspicious orders, and to comply with the physical security requirements imposed on registrants. It is also my preliminary finding, significantly in light of the rampant and deadly problem of prescription controlled substance abuse, that Woodfield's continued registration during the pendency of these proceedings would constitute an imminent danger to the public health or safety because of the substantial likelihood that Woodfield's failure to maintain effective controls against diversion will allow the diversion of controlled substances unless Woodfield's DEA CORs are suspended. Under the facts and circumstances described herein, it is my conclusion that Woodfield's continued registration while these proceedings are pending constitutes an imminent danger to the public health and safety. *See* 21 U.S.C. § 824(d). Accordingly, pursuant to the provisions of 21 U.S.C. § 824(d) and 21 C.F.R. § 1301.36(e), and the authority granted me under 28 C.F.R. § 0.100, DEA COR Nos. RW0502218, RW0502814, and RW0483317 are hereby suspended, effective immediately. Such suspension shall remain in effect until a final determination is reached in these proceedings.

**PURSUANT** to 21 U.S.C. § 824(f) and 21 C.F.R. § 1301.36(f), the Special Agents and Diversion Investigators of the DEA who serve this Order to Show Cause and Immediate Suspension of Registration are authorized to place under seal or to remove for safekeeping all controlled substances that Woodfield possesses pursuant to the registrations that I have herein suspended. The said Agents and Investigators are also directed to take into their possession DEA COR Nos. RW0502218, RW0502814, and RW0483317, and any unused controlled substance ordering forms.

**THE** following procedures are available to Woodfield in this matter:

1. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, Woodfield may file with DEA a written request for a hearing in the form set forth in 21 C.F.R. § 1316.47. *See* 21 C.F.R. § 1301.43(a). If Woodfield fails to file such a request, the hearing shall be cancelled in accordance with paragraph 3, below.

14

2. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, Woodfield may file with DEA a waiver of hearing together with a written statement regarding Woodfield's position on the matters of fact and law involved. *See* 21 C.F.R. § 1301.43(c).

3. Should Woodfield decline to file a request for a hearing, or should Woodfield request a hearing and then fail to appear at the designated hearing, Woodfield shall be deemed to have waived the right to a hearing and DEA may cancel such hearing, and I may enter my final order in this matter without a hearing based upon the evidence presented to me. *See* 21 C.F.R. §§ 1301.43(d) and 1301.43(e).

Requests for hearing should be filed by email with the Office of Administrative Law Judges at the following address: ECF-DEA@dea.gov, with a copy simultaneously provided to the Government at the following address: DEA.Registration.Litigation@dea.gov. Other correspondence concerning this matter, including requests referenced in paragraphs 1 and 2 above, should be addressed to the Hearing Clerk, Office of Administrative Law Judges, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, VA 22152. Matters are deemed filed upon receipt by the Hearing Clerk. *See* 21 C.F.R. § 1316.45. A copy of the same shall also be served separately on Government counsel, John E. Beerbower, and be addressed to the Office of Chief Counsel, Diversion and Regulatory Litigation, 8701 Morrissette Drive, Springfield, VA 22152.

_____
Anne Milgram
Administrator
Drug Enforcement Administration

cc: Hearing Clerk, Office of Administrative Law Judges
    John E. Beerbower, Counsel for the Government

15