# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
VIRTUS PHARMACEUTICALS, LLC,       )
)
         Plaintiff,     )     Case No. 1:21-cv-2308
)
   v.        )
)
MERRICK GARLAND, *et al.*,      )
)
)
        Defendants.    )
_____)

## VIRTUS PHARMACEUTICALS, LLC'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Karla L. Palmer (D.C. Bar No. 444353)
John A. Gilbert, Jr. (D.C. Bar No. 448379)
Michael S. Heesters
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth Street NW, Suite 1200
Washington, D.C. 20005
(202) 737-5600 (phone)
(202) 737-9329 (fax)
kpalmer@hpm.com
jgilbert@hpm.com
mheesters@hpm.com

*Counsel for Virtus Pharmaceuticals, LLC*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.      Virtus is Entitled to Relief from this Court Because it is Likely to Prevail on Its
        Claims........................................................................................................ 3

        A.      DEA's Decision to Retain Virtus's Product is Final Agency Action
                Reviewable by this Court. ....................................................... 3

        B.      DEA's Discretion Pursuant to 21 U.S.C. § 824(b) Is Judicially
                Reviewable. ........................................................................... 6

        C.      DEA's Immediate Suspension Order Does Not Provide A Reasoned
                Basis for The DEA to Retain Virtus's Levorphanol And
                Phendimetrazine. ................................................................. 12

        D.      Virtus Has Been Deprived Of Due Process. ........................... 14

        E.      Virtus's Harm from DEA's Actions is Irreparable: To Its Business,
                Customers, and their Patients. ............................................. 18

        F.      The Balance of the Equities Does Not Favor the Government. ........ 20

CONCLUSION ................................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967).............................................................. 3, 6, 7

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ............................................. 8

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018)....................................................... 7

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ................................................................. 17

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012)................................... 18

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986)............................................ 3, 6

*Clinton v. City of New York*, 524 U.S. 417 (1998)......................................................... 9

*Cody v. Cox*, 509 F.3d 606 (D.C. Cir. 2007) ................................................................. 7

*Disch v. Raven Transfer & Storage Co.*, 561 P.2d 1097 (Wash. Ct. App. 1977)......................... 15

*FCC v. Fox TV Stations, Inc.*, 567 U.S. 239 (2012) ...................................................... 18

*Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470 (3d Cir. 1995) ........... 16

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ............................................. 9

*Heckler v. Chaney*, 470 U.S. 821 (1985) ....................................................................... 11, 12

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ...................................................... 8

*Morris v. Gressette*, 432 U.S. 491 (1977)...................................................................... 7

*Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8 (D.C. Cir. 2005) ...................................... 3, 6

*Natural Res. Def. Counsel v. EPA*, 22 F.3d 1125 (D.C. Cir. 1994)............................... 4, 6

*New York Stock Exch. v. Bloom*, 562 F.2d 736 (D.C. Cir. 1977) ................................... 3

*PDK Labs, Inc. v. Ashcroft*, 338 F. Supp. 2d 1 (D.D.C. 2004)....................................... 3, 4, 6

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011)................................................... 10, 11

*United States v. Stevens*, 559 U.S. 460 (2010)................................................................... 18

*Wayte v. United States*, 470 U.S. 598 (1985)...................................................................... 11

**Statutes**

21 U.S.C. § 801 ................................................................................................................. 1, 2

21 U.S.C. § 824 ............................................................................................................... 1, 12

21 U.S.C. § 824(b) .................................................................................................... 4, 8, 17

21 U.S.C. § 824(d) ......................................................................................................... 7, 12

21 U.S.C. § 824(f) .................................................................................................................. 8

5 U.S.C. § 704 ....................................................................................................................... 3

**Federal Register Materials**

70 Fed. Reg. 33,200 (June 7, 2005) ...................................................................................... 9

86 Fed. Reg. 40,621, 40,623-24 (July 28, 2021) ................................................................. 9

**Other Authorities**

Mission Statement of DEA Diversion Control Division ....................................................... 1

**INTRODUCTION**

The Controlled Substances Act ("CSA") and its implementing regulations are intended to ensure the availability of controlled substances for authorized medical, scientific, research, and industrial purposes, while also establishing a closed chain of distribution to reduce the potential of these drugs being diverted out of legitimate channels for illegal purposes such as drug abuse. 21 U.S.C. § 801. The CSA protects the public's health and safety from dangers of diversion into the illicit market, while also ensuring that patients have access to pharmaceutical controlled substances for legitimate medical purposes such as the treatment of pain. *Id.*; *see also* Mission Statement of DEA Diversion Control Division, https://www.dea.gov/operational-division/diversion (last accessed Sept. 6, 2021).

Despite the Drug Enforcement Administration's ("DEA's") mandate to protect the public both by preventing diversion and ensuring the supply of controlled substances, DEA has taken the position that it has absolute, unfettered, and "boundless" discretion to seize and retain an innocent third party's controlled drugs—even when doing so harms the patients it is charged with protecting. But DEA does not have absolute discretion to retain a third party's drugs because the CSA and, specifically, 21 U.S.C. § 824, places constraints on DEA's discretion. When DEA's actions result in imminent danger to the public health or safety, then DEA's discretion has ended and the courts may, and should, exercise its ability to restrain DEA. Specifically, an order permitting Virtus to transfer its levorphanol and phendimetrazine to another DEA registrant in good standing, will negate an imminent shortage of these important drugs to patients and avoid catastrophic harm to Virtus's business operations.

DEA's brief does more than argue for "boundless" discretion. DEA even argues that Virtus's precarious financial position, resulting from DEA's retention of its drugs, is somehow

1

Virtus's fault.  Defs.' Mem. of Law in Opp'n to Pl.'s Motion for a Temp. Restraining Order at 27-28 (Sept. 4, 2021) ("DEA Brief").  DEA argues that Virtus apparently should have known its third-party logistics provider, Woodfield Distribution, LLC ("Woodfield") allegedly was involved in drug diversion and was about to lose its DEA registration.  Thus, Virtus should somehow seek monetary damages from Woodfield, instead of an equitable remedy from DEA.  Yet, DEA is the party that retains possession of Virtus's drugs.  DEA is the party that refuses to release Virtus's drugs.  DEA is the party that can most expeditiously rectify Virtus's situation.  It is DEA's job to monitor its DEA registrant Woodfield for diversion and security issues.  And it is DEA's unlawful actions that have compounded Virtus's predicament.  Moreover, Virtus would be out of business before it could collect any damages from Woodfield.  These arguments from DEA, like much of its opposition brief, seem superficially sound, but disintegrate upon closer examination.

DEA's brief also is an exhibit of boundless hubris.  Not only does DEA claim unfettered discretion, DEA goes so far as to argue that—even if this Court orders DEA to release Virtus's drugs—actual release and transfer of the drugs "is wholly unworkable as a practical matter."  DEA Brief at 32.  DEA is effectively taking the position that there is no way for it to work with Virtus and specifically another DEA-registered distributor to transfer Virtus's drugs.  This argument stretches the bounds of legitimate advocacy.  However, even if true, this is further evidence of the organizational and bureaucratic chaos that has led to the unreasonable and unlawful decision to retain Virtus's drugs when there is no valid reason to do so.  Therefore, the government's claim of the "unworkab[ility]" associated with unsealing or releasing certain product—to a DEA registrant—is simply unpersuasive compared to Congress's statements concerning ensuring public access to needed medications.  *See, e.g.*, 21 U.S.C. § 801 (stating that "[m]any [controlled drugs] have a useful and legitimate medical purpose and are necessary to maintain the health and general

2

welfare of the American people.").

## ARGUMENT

I. **Virtus is Entitled to Relief from this Court Because it is Likely to Prevail on Its Claims.**

### A. DEA's Decision to Retain Virtus's Product is Final Agency Action Reviewable by this Court.

The APA allows for review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Supreme Court has instructed that this "finality requirement" be applied in a "'flexible' and 'pragmatic way.'" *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967)). DEA, however, has taken the position that its decision to retain Virtus's levorphanol and phendimetrazine is not reviewable because it is not final agency action. This position is wrong.

To evaluate the finality of an agency decision, a two-part test is employed: "[1] the action under review must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature; . . . [2] the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (citations and internal quotation marks omitted). Moreover, "how an agency characterizes its actions does not determine whether they are final." *PDK Labs, Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 10 (D.D.C. 2004) (citing *New York Stock Exch. v. Bloom*, 562 F.2d 736, 740 (D.C. Cir. 1977) ("The label an agency attaches to its actions is not determinative. The action may be reviewable even though it is merely an announcement of a rule or policy that the agency has not yet put into effect. Indeed, agency action may be reviewable even though it is never to have any formal, legal effect.")). "Otherwise agency

3

rulings could escape judicial review simply by virtue of their form (or lack thereof), or because the agency refused to frankly acknowledge their finality." *PDK Labs, Inc.*, 338 F. Supp. 2d at 11 (citing *Natural Res. Def. Counsel v. EPA*, 22 F.3d 1125, 1132-33 (D.C. Cir. 1994)).  Rather, the key issue is whether the agency's position is "definitive" and has a "'direct and immediate effect' on the day to day business of the party challenging the agency." *PDK Labs, Inc.*, 338 F. Supp. 2d at 11 (citing, in part, *Nat. Res. Def. Council*, 22 F.3d at 1132).

Notwithstanding its arguments to the contrary, DEA Brief at 10-11, DEA's decision to retain possession of Virtus's levorphanol and phendimetrazine constitutes final agency action. First, DEA, when it suspended Woodfield's registration, seized Virtus's levorphanol and phendimetrazine, despite having the statutory authority to "limit revocation or suspension of a registration to the particular controlled substance . . . with respect to which grounds for revocation or suspension exist."  21 U.S.C. § 824(b).  DEA, however, made the decision to seize Virtus's levorphanol and phendimetrazine, although it was not the focus of DEA's investigation.[1]  DEA then doubled-down on their decision.  When Virtus repeatedly informed DEA that the levorphanol and phendimetrazine belonged to it, and that Virtus had no other supply of such drugs, DEA refused to release the drugs—even though DEA's investigation was not directed at Virtus.  In this lawsuit, DEA has also not alleged any fact indicating it may reverse its decision to not release the drug products.  Indeed, DEA even declares that if this Court orders the return of Virtus's drugs, then DEA may not comply because it would be "wholly unworkable as a practical matter," DEA Brief at 33, because DEA is storing the drugs across multiple warehouses.  Moreover, Virtus has no administrative or other legal remedies available to achieve the release of its drugs—except this

---

[1] DEA mentions these products on page 4 of the Immediate Suspension Order ("ISO"), where it states that, in March 2020, almost 18 months ago, Woodfield was unable to account for dosage units of levorphanol and phendimetrazine.

4

lawsuit seeking injunctive relief.  Virtus, therefore, has no other alternative than to seek relief in this Court.  Consequently, DEA's decision denying release of Virtus's product constitutes final agency action because it is "definitive."

Second, DEA's decision to retain Virtus's levorphanol and phendimetrazine has deleteriously affected Virtus's rights.  As detailed extensively in Virtus's opening brief, and the Smith Declaration attached thereto, the majority of Virtus's day-to-day business is suffering direct and immediate effects stemming directly from DEA's unlawful decision.  Pl.'s Brief in Support of Temp. Restraining Order ("TRO") at 15-16, 17-26 (Aug. 31, 2021).  Virtus is also experiencing adverse legal obligations from DEA's decision.  Specifically, since DEA's seizure, Virtus has issued Force Majeure notifications to approximately 100 customers in an attempt to limit failure to supply penalties from its customers.  *Id.* at 23-24; Declaration of Todd Smith in Supp. of Pl.'s Motion for TRO ¶ 35 ("Smith Decl.").  Several large customers have responded that they do not accept the Force Majeure event, leaving Virtus liable for financial penalties until the supply issue has been resolved.  DEA's decision, therefore, constitutes final agency action because it is adversely affecting Virtus's rights and obligations and is placing Virtus in legal peril concerning its day-to-day business with respect to its contract counterparties.

DEA argues, however, that Virtus had discussions with multiple "subordinate officials in the DEA's Office of Chief Counsel," DEA Brief at 11, and "[a]t most, the discussions . . . reflect the ongoing consideration of Virtus's proposals by subordinate officials in the context of avoiding potential litigation."[2]  *Id.* at 12.  First, whether or not the DEA officials that Virtus's counsel spoke

---

[2] The government uses these same discussions with "subordinates" to also support its theory that Virtus's constitutional "opportunity to be heard" in this matter somehow occurred through counsel in discussions with these same DEA subordinates.  DEA Brief at 25.  The post-deprivation "opportunity to be heard" solely through counsel, and with DEA subordinates simply cannot be

to are "subordinate" is not determinative of finality.  *PDK Labs, Inc.*, 338 F. Supp. 2d at 10 (holding that a rule by a subordinate official is "not dispositive" and that "[f]inality must be interpreted in a flexible and pragmatic way.") (citing, in part, *Abbott Labs.*, 387 U.S. at 152).  It is also notable that DEA does not explicitly (or implicitly) dispute Virtus's description of its conversations with DEA.  Second, there is no requirement that DEA must announce a formal decision regarding Virtus's drugs in order for its decision to be final.  *Nat. Res. Def. Council*, 22 F.3d at 1132-33.  Third, as described above, DEA cannot simply declare that its decision to retain Virtus's levorphanol and phendimetrazine is not final.  *See, e.g.*, *id.*  Moreover, the "the absence of a formal statement of the agency's position . . . is not dispositive." *Id.* (quoting *Ciba-Geigy*, 801 F.2d at 438 n.9).  Fourth, finality is determined by the nature and consequences of an agency's decision—definitive action that determines/alters a party's rights, obligations and/or has legal consequences. *Nat'l Ass'n of Home Builders*, 415 F.3d at 13.  DEA's decision meets these criteria here and is, therefore, final agency action reviewable by this Court.

## B.  DEA's Discretion Pursuant to 21 U.S.C. § 824(b) Is Judicially Reviewable.

DEA argues that it has complete and unfettered discretion pursuant to 21 U.S.C. § 824(b) and that such discretion is not judicially reviewable because there are "no conceivable standards that the Court could apply to determine if the DEA abused its discretion in declining to limit the suspension order."  DEA Brief at 13.  DEA's position does not comport with the law or sound policy.

---

sufficient to meet constitutional requirements here.  Furthermore, the supposed "opportunity to be heard" upon which the government relies demonstrates that, during these communications, DEA did not convey that its decision making was one committed to DEA's unreviewable "discretion," and thus DEA's decision concerning Virtus's drugs was allegedly unreviewable.  To the contrary, DEA instead conveyed to counsel for Virtus, after taking many days to consider the release of Virtus's product, that it believed it had no "authority" to release Virtus's product.  Declaration of David Schumacher in Supp. of Pl.'s Motion for TRO ¶ 6.

"[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Morris v. Gressette*, 432 U.S. 491, 501 (1977) (citing *Abbott Labs.*, 387 U.S. at 140). "The reviewing court must determine whether Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." *Morris*, 432 U.S. at 501 (internal citation and quotation omitted). There is no provision in the CSA or its implementing regulations that expressly precludes judicial review of DEA's discretion pursuant to 21 U.S.C. § 824(b). There is also no implicit preclusion of judicial review. Indeed, DEA never alleges as much in its brief.

DEA's unfettered discretion argument centers on their supposition that 21 U.S.C. § 824 provides no "judicially manageable standards" that would allow a court to evaluate DEA's decision to seize and retain Virtus's levorphanol and phendimetrazine. But that is not true. First, "courts must apply a presumption in favor of judicial review and must treat section [5 U.S.C. §] 701(a) as a very narrow proviso that applies only in rare instances." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 102 (D.D.C. 2018) (citing *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007)) (internal quotation marks omitted). Second, the facts of this case demonstrate that there is an applicable statutory standard and DEA **has** supposedly applied it. DEA suspended Woodfield's registration pursuant to 21 U.S.C. § 824(d) because Woodfield's Houston facility allegedly posed an "imminent danger to the public health or safety." *See* 21 U.S.C. § 824(d) (allowing immediate suspension of a DEA registration upon a finding that the registrant poses an "imminent danger to the public health or safety."). That is the standard DEA applied in this case. Upon serving an immediate suspension, DEA is permitted to seal all controlled drugs in the possession of the registrant, but DEA also has the discretion to limit the suspension to particular controlled drugs.

7

21 U.S.C. § 824(b), (f).

The statutory construction and implementation of 21 U.S.C. § 824 demonstrate that its subparts are intertwined and complementary to each other.  DEA, however, summarily argues that "the DEA's purely discretionary decision to limit a suspension to particular controlled substances under section 824(b), which is at issue here, is separate and distinct from the question of whether to suspend a registration *at all* under section 824(a), and whether to exercise the authority under section 824(d) to do so simultaneously with the institution of proceedings."  DEA Brief at 14.  These statutory provisions are not, however, "separate and distinct."  DEA does not cite to any authority requiring such separation and ignores the important interplay between the provisions of the statute.

The title of 21 U.S.C. § 824 is "Denial, revocation, or suspension of registration." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (noting that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (citation omitted); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  The title of section 824 indicates that each subsequent provision is intended to work together in describing how and when the DEA may deny, revoke, or suspend a registration.  Moreover, if DEA's construction of section 824 is correct, then DEA has absolute, unfettered, and indeed ***unreviewable*** discretion over which drugs it may seize upon issuance of an ISO.  But this cannot be correct.  For example, DEA admits that "Congress contemplated in the CSA that the DEA may find it necessary to place under seal controlled substances owned by unregulated third parties like Virtus, and the CSA clearly authorizes the agency to do so."  DEA Brief at 28.  Consequently, under DEA's

construction espoused here, Congress contemplated that innocent third parties may be affected by DEA's actions regarding sealing and seizing controlled drugs pursuant to section 824; but at the same time, Congress intended to give DEA unfettered discretion, which denies outright innocent third parties the ability to challenge such DEA actions.  This interpretation makes no sense and is impermissible.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) ("Acceptance of the Government's new-found reading of [the disputed statute] 'would produce an absurd and unjust result which Congress could not have intended.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574 (1982)).  The only way to arrive at such a conclusion is to ignore the statute as a whole and read section 824(b) in isolation.  Consequently, the presumption of reviewability, coupled with a fair reading of section 824 as a whole, demonstrates that there is a "judicially manageable standard" in this matter.  These standards are found within section 824 itself.

The government's argument that there are no conceivable standards that the Court could apply to determine if DEA abused its discretion in declining to limit the suspension order under section 824(b) ignores the fact that judicially manageable standards are articulated in section 824(a).  As the government acknowledges, section 824(a) specifies the findings upon which to base a suspension or revocation.  Thus, a reasonable interpretation of section 824, read as a whole, is that these same factors can be used to determine whether to limit a suspension or revocation under section 824(b).  In particular, the public interest standard articulated in section 823 and identified in section 824(a)(4) has been the basis for numerous DEA decisions over the years related to the scope of revocations and suspensions.  *See, e.g.*, 86 Fed. Reg. 40,621, 40,623-24 (July 28, 2021); 70 Fed. Reg. 33,200 (June 7, 2005) (granting of restricted registration).  Here, ensuring that the supply of an important medicine continues to be available to patients is in the public interest.  Moreover, the government has not indicated any ongoing concern about an

imminent threat to the public health and safety if this product is released to a DEA-registered distributor to ensure its continued, needed supply to pharmacies and patients.

The DEA, when immediately suspending the registration of Woodfield's Houston facility, specifically exercised its discretion under the "imminent danger to the public health or safety standard" to seize "twenty-nine tractor trailers' and five box trucks' full" (DEA Brief at 32) of controlled drugs. Presumably this was because the registrant allegedly posed a risk commensurate with such a large seizure. However, after the initial seizure, Virtus informed DEA that the levorphanol and phendimetrazine belonged to it, and that they would like to have another appropriately registered distributor—that does not pose an "imminent danger to the public health or safety"—distribute such drugs to its customers. Moreover, Virtus's product only represents a small amount of the seized product. Declaration of Gregory Bass in Supp. of Pl.'s Motion for TRO Bass Decl. ¶ 21 ("Bass Decl."). DEA then repeatedly refused to release the drugs. This final decision by DEA violates the APA. And the standard that this Court should apply is the standard enunciated in the statute and which DEA allegedly applied itself when immediately suspending the registration of Woodfield's Houston facility: Does release of *Virtus's* levorphanol and phendimetrazine pose an "imminent danger to the public health or safety." Upon application of this standard, allowing Virtus's drugs to be distributed *through another distributor with the appropriate DEA registration* will not pose an "imminent danger to the public health or safety." DEA has not, and cannot, allege as much.

DEA also argues that "[its] consideration of whether to limit a registration suspension for particular controlled substances possessed by a registrant is closely akin to a decision not to undertake an enforcement action." DEA Brief at 13-14. DEA even cites *Sierra Club v. Jackson*,

648 F.3d 848, 856-57 (D.C. Cir. 2011),[3] which is a case examining an agency's decision not to take enforcement action for the proposition that a statute using both the mandatory "shall" and the permissive "may" was found to provide no meaningful standards.  DEA Brief at 13.  But these arguments are inapposite.  The decision not to prosecute or not to take enforcement action has nothing to do with Virtus, the ownership of its drugs, or the taking of the same by DEA.  There are no allegations that Virtus is engaged in, or aiding and abetting, any illegal activities.  Virtus and its drugs, in the hands of another DEA-registered distributor as described above, also would pose no "imminent danger to the public health or safety."  DEA could not, even if it wanted to, take enforcement action directly against Virtus or choose to abstain from the same.  DEA's analogy does not, therefore, change the fact that DEA is inappropriately reading section 824(b) in isolation from the remainder of the statute.

DEA also cites *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) for the proposition that, if Congress does not provide "judicially manageable standards" for how an agency should exercise its discretion, then an agency's decision making "is entirely left to the discretion of the Agency."[4] DEA Brief at 12-13.  The *Heckler* court was specifically considering whether the FDA's decision to not institute investigative or enforcement proceedings regarding the use of particular drugs for lethal injection was reviewable.  The Court held that "the presumption that agency decisions not to institute proceedings are unreviewable under 5 U.S.C. § 701(a)(2) is not overcome by the

---

[3] Note also that the *Sierra Club* court stated that it must consider the statute as a whole, and not any one provision in isolation.  *Sierra Club*, 648 F.3d at 856 (stating that the court "cannot, however, consider those words in isolation . . . [it] must also consider the language and structure of the statute to determine whether the Administrator retained discretion in the statutory duty so as to render her decision unreviewable.").

[4] DEA also cites a similar (although irrelevant), case, *Wayte v. United States*, 470 U.S. 598, 607 (1985), for the proposition that "a decision not to prosecute is almost invariably unreviewable." DEA Brief at 14 (internal citation omitted).

enforcement provisions of the [Food, Drug, and Cosmetic Act]." *Heckler v. Chaney*, 470 U.S. 821, 837 (1985). This case, however, is not about whether DEA should or should not take enforcement action against Virtus or Woodfield. This case is not about whether DEA should prosecute any other party. It is about protecting the public from "imminent danger to the public health or safety" (21 U.S.C. § 824(d)), and whether DEA should release specific drugs when the threat of imminent danger has passed in order to protect patients that depend on those same drugs. This is entirely different than an agency's decision whether or not to investigate or prosecute a third party. Moreover, unlike *Heckler*, where the parties were arguing whether there was any support in the entire Federal Food, Drug, and Cosmetic Act that represented a judicially manageable standard, the judicially manageable standards in this case are found within the same statute (*id.* § 824) that gives DEA the authority to limit its ISOs. *Heckler* and *Wayte* are, therefore, factually and legally distinguishable, and inconsistent with this case.

### C. DEA's Immediate Suspension Order Does Not Provide A Reasoned Basis for The DEA to Retain Virtus's Levorphanol And Phendimetrazine.

DEA argues that Congress granted it "wide (indeed boundless) latitude" to determine how to limit an ISO. DEA Brief at 15. Not so. While DEA does have a broad mission when suspending a license pursuant to 21 U.S.C. § 824(d)—to prevent "imminent danger to the public health or safety—that mission is not "boundless." Here, releasing Virtus's drugs to another appropriately registered distributor will "end" whatever alleged imminent danger to the public exists. Not to do so puts Virtus's business in jeopardy, along with the thousands of patients that rely on its drugs— particularly levorphanol, which is used in hospice and cancer patients that have failed other opioids. It would be ironic, if it were not so sad, that the same agency tasked with preventing imminent danger to the public health or safety resulting from controlled drugs is currently ***causing*** imminent danger to the health and safety of an extremely fragile patient population.

The DEA's argument continues by explaining, in general, how its investigation determined that Woodfield was involved in drug diversion.  Absent from DEA's explanation is any allegation that Virtus's levorphanol and phendimetrazine were being diverted.  Indeed, phendimetrazine is anti-obesity drug that has no street value.  Despite this fact and the current posture of this case, DEA argues that "[n]one of the DEA Administrator's preliminary findings have changed since it issued the suspension order" and DEA is, therefore, permitted to retain Virtus's drugs.  Again, while nothing may have "changed" with Woodfield, there is a change with Virtus's levorphanol and phendimetrazine.  Virtus can distribute these drugs—which were not being diverted—through another registrant.  Whatever imminent danger to the public health or safety existed concerning Virtus's levorphanol and phendimetrazine has been eliminated because Virtus can sell its drugs through another DEA-registered distributor.  Moreover, while DEA is correct that the ISO provides the legal basis to seize Virtus's drugs, it does not confer a basis to indefinitely retain possession of a third-party, non-registrant's drugs where the imminent danger that led to the seizure can be negated.

DEA also argues that it does not have to make any specific findings regarding Virtus's drugs because Virtus is not a DEA registrant.  Again, however, section 824 contemplates interplay with third parties.  *See, e.g.*, DEA Brief at 28 (stating that "Congress contemplated in the CSA that the DEA may find it necessary to place under seal controlled substances owned by unregulated third parties like Virtus, and the CSA clearly authorizes the agency to do so.").  Section 824(b) gives DEA the discretion to limit the drugs subject to its ISOs, in part, to also protect third parties.  This is particularly important in drug diversion investigations (from which Woodfield's ISO allegedly resulted).  Drug diversion investigations require DEA to examine the source and final disposition of controlled drugs possessed by the registrant, which may at times be third parties.  21

13

U.S.C. § 824, therefore, permits, and in fact requires, DEA to consider third parties other than an ISO's direct target when suspending a registration based upon alleged drug diversion.  Virtus and its customers are third parties for which DEA failed to consider the ramifications of its ISO issued against Woodfield.  When DEA was informed by Virtus of the ISO's ramifications, DEA repeatedly refused to exercise discretion to release Virtus's drugs.  And that is the decision for which DEA has failed to make any adequate findings with respect to Virtus, let alone articulate a reasoned basis to retain such drugs—except that DEA supposedly has "wide (indeed boundless) latitude" to determine how to exercise its discretion.  DEA Brief at 15.  DEA's ISO does not, therefore, provide a reasoned basis for the decision at issue in this matter.

### D.  Virtus Has Been Deprived Of Due Process.

DEA's argument that Virtus is unlikely to prevail on its Fifth Amendment constitutional claim of deprivation of property without due process of law entirely misses the mark.  First, the Agency's conclusory allegation that "Virtus has, for purposes of storage and distribution, relinquished its property interest in the drugs at issue" is wrong.  DEA Brief at 21.  Virtus has done nothing of the sort.  While it is unclear what DEA intends to concede when it acknowledges that "Virtus owns the drugs (and still does, a[s] a technical matter)," *id.*, Virtus's ownership and property interests are far more than "technical."  DEA is on similarly shaky ground when it characterizes Virtus as retaining "miniscule practical property rights."  *Id.* at 23.  DEA's lack of understanding of property law and the nature of Virtus's property interests infects the entirety of its argument.  Contrary to DEA's argument, Virtus's property rights in the product remain undiminished.  Virtus owns the FDA drug approval, the intellectual property, and the specific drug product now held by DEA.  Virtus paid for the product and seeks to sell the product to its customers that need it and are out of stock.  As a result, DEA's conduct gives rise to a constitutional injury

14

to Virtus that can, and should, be reviewed by this Court.

DEA's Opposition throws up a host of red herrings and straw men in an effort to distract from the unavoidable core argument that DEA is making.  The Agency has indisputably taken property that belongs to Virtus and is depriving the Company of any property interests whatsoever, but according to the Agency because Virtus has no relevant rights in that property, DEA has unlimited authority to do whatever it wants whenever it wants, and this Court has no authority to even review the Agency's decision making.  That core argument cannot withstand scrutiny.  So, to avoid such scrutiny, DEA offers misdirection and distraction.

First, DEA argues that "Virtus voluntarily relinquished its property interest in maintaining possession of the drugs, entrusting Woodfield both to safeguard them and to maintain a valid registration that demonstrates compliance with the CSA and the DEA's regulatory scheme."  DEA Brief at 21.  The second clause is undoubtedly true, the first one, plainly not.  There is nothing about Virtus's decision to contractually transfer certain risks and obligations with respect to DEA compliance that supports the conclusion that Virtus "voluntarily relinquished" any "property interests."  Indeed, DEA's conclusory claim and characterization flies in the face of the law. Virtus's agreement with Woodfield was not any sort of "relinquishment" of any right whatsoever. While the exact nature of the relationship between Virtus and Woodfield need not be determined by this Court, suffice it to say that DEA's characterization is wrong.  *See generally Disch v. Raven Transfer & Storage Co.*, 561 P.2d 1097, 1099 (Wash. Ct. App. 1977) ("Merely entrusting another with possession of property has never been held to preclude the owner from asserting his title."). The contract between Virtus and Woodfield is, by DEA's own characterization, a bailment, and not a relinquishment.  "A bailment occurs when property is entrusted to a party temporarily for some purpose; upon the fulfillment of that purpose the property is 'redelivered to the person who

delivered it, otherwise dealt with according to his directions or kept until he reclaims it.'"
*Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.*, 67 F.3d 470, 475 (3d Cir. 1995).  In
sum, DEA cannot so easily extinguish Virtus's property rights.

Similarly off the mark is DEA's argument that because Virtus cannot "possess" the drugs,
its interests are unaffected by DEA's unlawful conduct.  Virtus's property interests are not
"abstract" and Virtus plainly has "a legitimate claim of entitlement" to its drug product.  It is
undisputed that Virtus cannot take physical possession of the products at issue, but that fact in no
way supports the conclusion that it has **no** property interest in what is happening to those products.
Virtus provided its products to Woodfield for a very specific purpose to facilitate sales and
distribution to Virtus's customers.  DEA's actions completely and fundamentally interfere with
that property interest and in the absence of a TRO from this Court will cause irreparable injury.

DEA cannot cite to even a remotely relevant case in support of its argument that the absence
of any right to challenge its actions still meets constitutional muster.  As suggested by its title,
*Lujan v. G & G Fire Sprinklers, Inc.* is neither factually nor legally relevant.  It is true that
constitutional due process depends on the importance of the interest involved, but again DEA
fundamentally misapplies the standard.  DEA's interpretation of its statutory and regulatory
authority permits it to wholly ignore the concerns of the ***actual owner*** of drug product while that
owner suffers irreparable injury based on the deprivation of its property.  Against that interest,
DEA offers only the hypothetical concern that recognizing the interests of non-registrants could
make the administrative process more cumbersome.  But any such cumbersomeness is
constitutionally mandated when the non-registrant has a constitutionally protected property
interest, such as the one that Virtus has in the present case.

The government similarly asserts that there is a difference between Virtus "owning" the

drugs versus "holding" the drugs, and that Virtus does not have a "property interest" in "holding" the drugs at issue. DEA Brief at 21. Virtus knows of no case law—or other instance—where a court has differentiated an entity's constitutionally protected right to due process on this novel theory. It is indisputable that Virtus owns the product at issue—Virtus owns the ANDA. Virtus paid for the product. Virtus has title to the product. DEA's actions have deprived Virtus of its right to the product and to sell that product through a ***different DEA registrant***[5] to its customers that need the product. When Virtus ***sells*** the product to a customer, it is a transaction that involves payment to Virtus and transfer of title from Virtus to its customer, not Woodfield. It is not disputed that DEA has the discretion to limit revocation or suspension of a registration (21 U.S.C. § 824(b)), and that this Court has the authority, now, even to order the sale of Virtus's product pursuant to section 824(f). Unlike what the Court stated in *Bd. of Regents v. Roth*, 408 U.S. 564, 566 (1972), cited by the government (DEA Brief at 22),[6] Virtus's interest is indeed based not on a government "benefit" but instead on Virtus's tangible purchase of, title to, and ownership of the property at issue.[7] Virtus's ownership interest (versus "contractual" possession) does not "constrain" its right to due process; and there is no case law supporting the government's untenable position that

---

[5] Contrary to the government's assertions in its Opposition, Virtus has ***never*** sought DEA's release of the product to **Virtus**. Instead, Virtus has repeatedly requested that DEA release the product to another DEA registrant.

[6] The Government's reliance on *GE v. Jackson*, 610 F.3d. 110, 117 (D.C. Cir. 2010), is similarly unpersuasive. In that case the "interest" at stake was the intangible interest of the market's assessment of their stock, brand, and credit worthiness, and not the plaintiff's valuable tangible property that was seized by the government's action. As stated in the Smith Declaration, Virtus's property interests at stake by DEA's actions are significant. And, the DEA's deprivation of this property is catastrophic to the Company. Smith Decl. ¶¶ 32-42.

[7] *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) ("[T]he prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference.").

17

communications with Virtus's "counsel" after the seizure satisfy the government's due process requirement here (DEA Brief at 23-24).

Moreover, even assuming that DEA's position might ever be a legitimate one, its present position suffers from an additional and independent Fifth Amendment constitutional infirmity. It is well established that the Constitution requires that agencies provide fair warning of what their regulations prohibit and permit. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time . . . ."). "[T]he due process protection against vague regulations 'does not leave [regulated parties] . . . at the mercy of noblesse oblige.'" *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 255 (2012) (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). Here, DEA announces its extraordinary notion for the first time in this proceeding, staking out a sweeping position that extinguishes Virtus's valuable property rights. At a minimum, DEA should be required to make this purported policy clear prospectively to allow Virtus and other DEA-regulated companies to make decisions against a clear regulatory backdrop. Therefore, even assuming that DEA's present position could, at some point, be a valid agency position, the lack of fair notice to Virtus is an additional and independent reason why DEA's position gives way to a protected constitutional right that warrants review by this Court.

### E. Virtus's Harm from DEA's Actions is Irreparable: To Its Business, Customers, and their Patients.

The government concedes that Virtus supplies a "significant portion of the levorphanol in the market," but argues that Virtus has not established that patients would be harmed by the continued possession of the drug by DEA. DEA Brief at 31. This argument is nonsensical. If the

government continues to hold all of the product for the most significant supplier of that medicine in the United States, what more evidence does the government need that this action will adversely affect supply and harm patients? Bass Decl. ¶¶ 5, 9, 10, 19. But the government goes even further, and "has a reason to doubt as a factual matter" the representations made by Virtus in regard to the supply and availability of quota for levorphanol. DEA Brief at 31. To this end, DEA appears to be accusing Virtus of either purposefully or unwittingly misrepresenting the amount of product available for patients. The former is a serious unfounded accusation and the latter is simply contrary to any financial interest Virtus would have. As discussed in the attached Declaration of Gregory Bass, Virtus has accurately portrayed the dire supply situation and the significant harm to its customers and patients, in addition to the catastrophic harm described in the earlier Declaration of Todd Smith, submitted in Support of Virtus's Opening Memorandum.

There can be no dispute that DEA's actions here are leaving pharmacies and their patients in at least a precarious supply situation because, as demonstrated, Virtus is unable to supply product to its customers. And with respect to those patients that depend on a levorphanol for treatment of their chronic pain, consistent with the warnings on the Virtus levorphanol label (which is reviewed by FDA), sudden withdrawal from opioid products is harmful to patients. *See* Bass Decl. ¶ 19 (citing to and attaching levorphanol label). The label states:

> Do not abruptly discontinue Levorphanol Tartrate Tablets in patients who may be physically dependent on opioids. Rapid discontinuation of opioid analgesics in patients who are physically dependent on opioids has resulted in serious withdrawal symptoms, uncontrolled pain, and suicide. Rapid discontinuation has also been associated with attempts to find other sources of opioid analgesics, which may be confused with drug-seeking for abuse. Patients may also attempt to treat their pain or withdrawal symptoms with illicit opioids, such as heroin, and other substances.

FDA has publicly stated the same. In particular, "The U.S. Food and Drug Administration (FDA)

has received reports of serious harm in patients who are physically dependent on opioid pain medicines suddenly having these medicines discontinued or the dose rapidly decreased. These include serious withdrawal symptoms, uncontrolled pain, psychological distress, and suicide." *See* Declaration of Karla Palmer in Supp. of Pl.'s Motion for TRO, Exhibit A; (FDA Press Announcement, "FDA identifies harm reported from sudden discontinuation of opioid pain medicines and requires label changes to guide prescribers on gradual, individualized tapering," FDA Drug Safety Communication (Apr. 9, 2019)).  As stated, in the Smith Decl. ¶¶ 15-18, 21, Virtus understands and believes based on information provided by its customers over the past two weeks that its customers are unable to procure levorphanol for their patients. *Id.* ¶ 18; Bass Decl. ¶¶ 5, 10.  And, notwithstanding DEA's claims to the contrary, Virtus is not able to procure the product; its contract manufacturer is out of levorphanol active pharmaceutical ingredient ("API") and unable to make more product to meet Virtus's customer demand.  Bass Decl. ¶¶ 14-15, 21.  The lead time and ability to make more product for Virtus, is approximately 150 days, and that assumes that Virtus's contract manufacturer is able to obtain additional API quota.  Bass Decl. ¶¶ 14-15, 18.  And the reality is, Virtus, with its limited product portfolio, and its inability to supply its most important product, will imminently cease operations if the product at issue here is not released. *See, e.g.*, Smith Decl. ¶¶ 32-42.

### F.  The Balance of the Equities Does Not Favor the Government.

DEA concedes, as it must, that the Agency can either direct the registrant to place the controlled substances under seal or direct the registrant to deliver them to DEA for safekeeping.  Declaration of Brian Besser in Supp. of Defs.' Opp'n to Pl.'s Motion for TRO ("Besser Decl.") ¶ 35 (Sept. 4, 2021).  However, there have been a number of immediate suspensions issued by the Agency over the years involving serious allegations of diversion where

the Agency has found it sufficient to seal the product at the registered location in matters involving some of the country's largest registrants.  Notwithstanding the government's alleged "logistical" burden, the government greatly compounds its own burden by failing to provide any type of inventory (DEA Brief at 12) at the time it removed the product.  Bass Decl. ¶ 25.  Furthermore, the government makes much of these alleged logistical difficulties, which it claims are so problematic as to render "unworkable" any decision to unseal or otherwise move Virtus's substances to a DEA-registered distributor.  DEA Brief at 32-33.  The difficulties that DEA describes in the Mills Declaration (¶¶ 10-21), however, are solely of DEA's own doing, and could have been avoided in the same manner that DEA has avoided such issues in other ISO matters involving some of the largest drug suppliers in the world.  The government's own actions here should not factor in any way to tip the equities in the government's favor.  While DEA asserts that release of any of Virtus's controlled substances may represent a "significant hardship and challenge for DEA" (*id.* ¶ 11), the non-release of Virtus's levorphanol and phendimetrazine will go well beyond a "logistical" challenge for Virtus as stated in the Declaration of Todd Smith (Smith Decl. ¶¶ 32, 42; Bass Decl. ¶¶ 27-29).  Finally, Virtus remains ready, willing, and able to arrange for and accommodate whatever logistical requirements the DEA would need to address the transport of levorphanol and phendimetrazine to another DEA-registered facility in whatever manner the Agency deems appropriate.  Bass. Decl. ¶ 29.

## CONCLUSION

For the foregoing reasons, Virtus respectfully requests that this Court grant its motion for a temporary restraining order.

Dated: September 6, 2021          Respectfully submitted,


By:   */s/ Karla Palmer*
Karla L. Palmer (D.C. Bar No. 444353)
John A. Gilbert, Jr. (D.C. Bar No. 448379)
Michael S. Heesters
HYMAN, PHELPS & MCNAMARA, P.C.
700 Thirteenth Street NW, Suite 1200
Washington, D.C. 20005
(202) 737-5600 (phone)
(202) 737-9329 (fax)
kpalmer@hpm.com
jgilbert@hpm.com
mheesters@hpm.com

*Counsel for Virtus Pharmaceuticals, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 6th day of September 2021, she caused a copy of

**VIRTUS PHARMACEUTICALS, LLC'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER** to be served upon the following attorneys by electronic mail, as indicated:

Bradley Humphreys

U.S. Department of Justice

950 Pennsylvania Avenue NW

Washington, DC 20530

Tel: (202) 305-0878

Email: Bradley.Humphreys@usdoj.gov

*/s/ Karla Palmer*

Karla L. Palmer
*Counsel for Virtus Pharmaceuticals, LLC*